**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

FILED

03 OCT 23 PM 3: 01

U.S. DISTRICT COURT
N.D. OF ALABAMA

DANA J. HAYNIE )
                          )
       Plaintiff, )
                          )
v. )       Civil Action No.: 03-PT-0049-M
                          )
TYSON FOODS, INC., )
                          )
       Defendant. )

ENTERED

OCT 2 3 2003

## MEMORANDUM OPINION

This cause comes on to be heard upon defendant Tyson Foods, Inc.'s ("Tyson") Motion

for Complete Summary Judgment, filed on August 28, 2003.

### FACTS[1]

Tyson, a large Arkansas-based employer, operates a chicken processing plant in

Albertville, Alabama.[2]  Complex Manager Ricky Walker ("Walker") is the highest authority at

the Albertville complex and oversees two production sections: live production and processing.

Live production involves "growing" the chickens, i.e., making the feed, hatching the chicks, and

providing advice to growers.  The processing section processes the birds and ships the meat.

Jerry Weaver ("Weaver"), Plant Manager, oversees all aspects of the processing section.

Plaintiff Dana Haynie ("Haynie") at all times pertinent to this case worked in the

processing section of the Albertville plant.  The processing section runs three shifts – two

---

[1] Haynie's opposition brief states: "Haynie agrees with a great deal of the facts enunciated by Tyson in its summary judgment brief.  However, contrary to Tyson's contention, all of those facts are not undisputed."  This memorandum opinion notes where the facts are disputed.

[2] Although Tyson operates multiple facilities, only the Albertville, Alabama complex formerly operated by Hudson Foods, Inc. ("Hudson") is at issue in this case.



production shifts and one sanitation shift. Each shift has a shift manager. Each of the two production shifts has three superintendents who report to a shift manager. Each superintendent manages one of three processing areas: First Processing, Debone, and Further Processing. Each superintendent has salaried supervisors (also known as "team leaders") working in the different processing areas. Salaried supervisors, superintendents, and shift managers do not have the power to hire, fire, promote, or demote employees. Salaried supervisors do not have full disciplinary authority; instead, they must report employee infractions to the superintendent.

The Debone Department is divided into cone lines and trim tables, with each leader managing a certain number of lines and tables. On the cone lines, a chicken is placed on a cone and moves down an assembly line, where employees remove the meat from the bone. Debone's first shift begins at 6:30 a.m. and finishes around 3:00 or 3:30 p.m., depending on volume. Debone's second shift runs from 3:45 p.m. until around 12:30 a.m.

Haynie was hired by Hudson on July 12, 1993 as a technician in the Quality Control ("QC") Department. On January 23, 1995, Haynie transferred to an hourly supervisory position in the Marinated Raw Breading ("MRB") Packout Department. On January 7, 1998, Haynie became a Tyson employee. On February 1, 1999, Plant Manager Weaver promoted Haynie to a salaried supervisor/team leader position in MRB. Sometime in 2000, Haynie transferred to a salaried supervisor position in the Debone Department. In this position, Haynie reported directly to the First Shift Debone Superintendent, Pam Blackmun ("Blackmun"). During her employment at Tyson, Haynie routinely worked the first shift.

In May 2001, the Debone Department had problems with employees on first shift recruiting employees to transfer from second shift. The two shifts apparently disagreed about

2

the number of people needed to work each shift.  Vickie Snead ("Snead"), Second Shift Debone

Superintendent, was concerned that the first shift was recruiting employees off her shift to

transfer to first shift.  On May 18, 2001, superintendents and salaried supervisors were informed

that jobs were no longer going to be put up for bid and that if any second shift employee asked

about a job opening, the employee was to be sent to see his or her supervisor.  According to

Haynie's deposition testimony, agitation and antagonism between Snead's workforce and the

first shift workforce (of which Haynie was a member) had developed as of May 2001.  *See* Def.

Ex. 1 at 105-108.

Jerry Tilton ("Tilton"), Tyson Corporate Human Resource ("HR") Director,[3] testified that

on June 20, 2001 an anonymous complaint was made to Tyson's corporate hotline, alleging that

Snead and Cindie Light ("Light"), Plant HR Manager,[4] were involved in generating or obtaining

false documents for illegal aliens hired at Tyson's Albertville facility.  The anonymous call also

named several allegedly illegal aliens working at the plant.  Tilton and Ana Leland ("Leland"),

another Tyson corporate HR employee, immediately investigated the allegation.  No one at the

Albertville plant was informed of the investigation prior to its taking place.  Tilton informed

---

[3] Haynie's summary judgment submission provides these facts concerning Tilton: (1) Tilton works from company headquarters in Springdale, Arkansas; (2) Tilton is responsible for overseeing human resource operations at the Tyson facilities in Albertville, Alabama as well as those in Hope, Marvell, and Green Forest, Arkansas; and (3) Tilton serves as a liaison between his facilities and corporate HR.

[4] Haynie details Light's career at Tyson (based on Light's deposition testimony).  Light has been employed continuously at the Albertville facility since April 26, 1982, and never received any discipline during that time.  Light began as a poultry processor in the cut-up and packing department, became a quality assurance technician, and then transferred to the human resources department as an HR clerk.  In 1996 or 1997, Light became the plant's assistant HR manager, and in December 1998, she was promoted to plant HR manager.  While Light's title was changed to assistant complex human resource manager in July 2002, she had the same duties as before.  Light testified to handling the day-to-day operations in the human resource department, including training Tyson employees on Tyson's "Company Policy Concerning Team Member Harassment/Discrimination."("the Harassment Policy").  According to Light, she conducts annual discrimination training, which consists of showing videos/slides to employees and leading a question and answer session.

Walker that he was coming to the plant without identifying the purpose of his visit.  Leland

reviewed the employment records at the Albertville plant to locate employees with the names

reported on the hotline call.  Tilton and Leland then interviewed individuals who were either

named by the hotline caller or had similar names.  Leland asked the interviewees to provide

personal information such as their places of birth, ages, parents' names, etc.  Tilton and Leland

determined that some of the investigated individuals were illegal aliens and terminated their

employment.[5]  When the illegal workers were asked where they obtained false credentials,

allegedly none would reveal their source.  The illegal alien workers allegedly told the

investigators that no one at the Albertville facility sold them their false identification.  Tilton and

Leland also spoke with Cathy Zawaski, Janet Steele, and Serena Dupree, whose names were

mentioned in the hotline call.[6]  Haynie testified to no involvement in or knowledge of the June

2001 complaint or investigation.  Although the investigation identified several illegal workers,

Tilton and Leland found no support for the hotline allegations against Snead and Light.

However, Haynie asserts, "no questions were asked as to whether the false documents were

purchased from Snead or Light – the two subjects of the investigation."

On July 19, 2001, Haynie began performing some of the functions of the First Shift

Superintendent, Blackmun, who was taking medical leave.  In July and August 2001, Haynie

testified, she was upset because she was having to discipline and/or terminate employees

_____

[5] Tilton testified that Tyson did not report these immigration violations to the police, the INS, Homeland Security, or any other agency because that's "just our policy."

[6] Haynie highlights Tilton's testimony that while he neither took notes nor required written statements from employees Zawaski, Steele, and Dupree, Tilton found they had no "credible evidence" of wrongdoing.  Tilton testified that his interview with Steele "centered around the Hispanics and how they were treated."  Again, Tilton took no notes and remembered no specifics, but he believed Steele told him Hispanics were not treated fairly.

working on the first shift. The First Shift Supervisor, Blackmun, had been improperly allowing employees to take FMLA leave for impermissible reasons. For example, one employee attempted to take FMLA leave when she had dentures adjusted. While in the past Blackmun had permitted this leave under the FMLA, Light properly informed Haynie that the employee could not take FMLA leave for this absence, which resulted in the employee having too many occurrences under Tyson's attendance policy. As a result, Haynie had to inform the employee that she was terminated. Haynie testified that she had to fire fifteen people in one week in July or August 2001 for attendance problems because Blackmun had improperly classified prior leave as FMLA leave and that she knew "there was some bad things said about me after that." Plaintiff was "upset" and "worried about the reaction of the other debone employees."

Since Haynie was having difficulties with certain superintendent duties, such as completing FMLA paperwork, Haynie asked Light for assistance on several occasions. Light informed Weaver that Haynie needed help with certain superintendent duties, and Weaver called the shift manager to discuss what could be done to assist Haynie. Snead was the only other Debone Superintendent, and unlike Blackmun, worked the second shift. Because Snead was the only other experienced superintendent in the Debone Department, Weaver decided to have Snead split shifts, working four or five hours on first shift assisting Plaintiff and four or five hours on second shift as Second Shift Superintendent.

Weaver informed Haynie that Snead would be assisting her on first shift. According to Weaver, Haynie responded that it was a "big mistake" to place Snead on first shift and that the first shift employees were not going to like working with Snead. Weaver testified that he asked Haynie to work with Snead and give the idea a chance before jumping to a negative conclusion.

Haynie informed the first shift supervisors that, beginning on August 20, Snead would be working their shift several hours each day.  Plaintiff alleges that the first shift employees were "upset" and "not very happy" about Snead working on their shift and that one supervisor, Cathy Zawaski, even called Haynie at home because she was "upset" about working with Snead. Haynie called Complex Manager Walker at home to inform him that the first shift employees were upset about Snead working their shift.  Haynie told Walker "there was already enough pressure on [her]," and now Tyson was adding to the pressure by sending Snead to work on first shift.  When Weaver learned that Haynie went over his head and called Walker at home about Snead, Weaver told Haynie that she should not have gone outside the chain of command.

On August 20, 2001, Snead started working the split shift schedule.  By the end of August, Haynie testified, Snead had "upset a lot of people, and it caused a big ruckus.  It was like a commotion all the time about work."  Haynie further testified that Snead was "always causing something, like getting employees upset . . . . People hollering at her and her fussing with employees, you know, in front of people.  It was upsetting."  In notes made by Haynie during this time, she expressed frustration with the situation: "I thought I was supposed to be running Debone."  After working with Snead for one month, Haynie told an employee in the personnel department that she "didn't care what Vickie said."

On October 4, 2001, Haynie asked the First Shift Supervisor, Keith Rhodarmer ("Rhodarmer") to talk with Snead about "why or what she [had] a problem about" with Haynie. Haynie testified that by this time "something was definitely wrong between" Snead and her.  In notes dated October 15, 2001, Haynie stated that she thought Snead was working against her and not training her.  Haynie's notes dated October 17, 2001 also stated that Haynie was "so tensed

6

up from working in a hostile environment." By mid-October, Haynie was "frequently agitated" about working with Snead. Around this time, Haynie started taking prescribed anti-depressants because of the onset of depression. According to Haynie's testimony, her mother's illness was a source of depression, especially in November when she knew her mother's illness was in the final stages.[7]

On October 24, 2001, Light testified, Haynie reported to Cindie Light alleged unlawful employment practices pertaining to Hispanic employees: Haynie thought Snead was involved in hiring illegal aliens at Tyson, and Haynie had observed an individual named Joseph Yepez ("Yepez") hand a suspicious badge to the guard at Tyson. According to Light, Haynie further stated that she thought Snead was firing team members at night, collecting their time cards, and bringing in outside people to work in the terminated employees' places. Haynie further informed Light that Tyson's nurse was involved in bringing individuals into work under false identities and was signing off on unperformed physicals. Haynie also told Light that Snead's husband was getting false documentation for illegal aliens working at Tyson.[8] Light immediately repeated these allegations to Jerry Phillips ("Phillips"), Complex Human Resource Manager at the Albertville facility.[9]

---

[7] However, Haynie testified, her mother's illness was not the primary source for her November 2001 depression.

[8] In fall 2001, Walker testified, Tyson was indicted by a federal grant jury for illegal immigration practices, i.e., hiring undocumented Hispanic workers. The Albertville complex was named in the indictment. Walker testified to his belief that the indictment preceded Haynie's allegations about unlawful employment practices. Walker confirmed that Haynie's allegations were not relayed to federal authorities.

[9] Haynie notes Light's failure to open an investigation file, contemporaneously record this conversation, or ask or require Haynie to compose a written statement. *See* Pl. Ex. 3 at 30-31, 37. Furthermore, Haynie argues:

Light does not remember (and, by her own admission, cannot deny) that Haynie reported:
(1) that Hispanic employees had been instructed to list at least seven dependents on their

Phillips immediately spoke to Walker and informed him of Haynie's allegations that

Snead was involved in the hiring of illegal aliens.[10]  Phillips testified to remembering allegations

that Snead either made or gave fake ID's to employees.  Phillips also testified:

> [Haynie alleged] Snead would fire a person or tell a person that they no longer
> had a job at Tyson Foods and would walk them to the door and take their ID but
> never processed a separation notice on them.  And we were told that she was calling
> people she knew who would come up to the plant and she would present them with
> the ID card that she had gotten from the person, and that person would go to work
> and assume the identity of the person she had escorted out, whether it be that same
> night or nights before.

---

W-2 forms so that no federal withholding taxes would have to be taken out; (2) that Snead,
a superintendent at the plant, would not allow Hispanic employees to bid on open jobs; and
(3) that Snead would threaten to terminate Hispanics if, in fact, they bid on open jobs.

*Id.* at 32-33.

[10] Walker testified that Haynie told him Snead was involved in providing documents to illegal workers and
that Haynie seemed credible.  Specifically, Walker stated:
*Q: Now, in October of 2001, did there come a time where there was another allegation of illegal
immigration practices at the Tyson plant in Albertville?*
A: Yes.
*Q: Did you become aware of that?*
A: Yes.
*Q: Who made those allegations?*
A: Dana.
*Q: That's Dana Haynie.*
A: Yes.
*Q: Tell me how you found out about her allegations.*
A: She came to my office and told me.
. . . .
*Q: What did Dana tell you?  What were her allegations?*
A: I don't remember specifically, but that Vicki, again, was involved in providing documents to some
of the illegal workers.
*Q: Do you remember anything else Dana would have told you . . . ?*
A: Not specifically.
. . . .
*Q: Do you know if Dana ever told you that Vicki Snead was firing team members at night, collecting
their cards, and bringing in someone to take that person's place, an illegal worker?*
A: I was told that, but I don't remember if it was Dana or Janet Steele that told me.
Pl. Ex. 9 at 25-27.

Haynie points out that Walker did not take notes, ask Haynie to prepare a written statement, or ask her for
witnesses' names.  Walker denied being told in the course of the October 2001 investigation that Snead encouraged
Hispanic workers not to bid on open jobs or that someone in Tyson management instructed Hispanic workers to list
at least seven dependents on their tax forms.  *Id.* at 28.

8

Walker repeated these allegations to Tilton at Tyson's corporate office and said a second

investigation was needed.  According to Tilton, Phillips described to him Haynie's allegations as

follows:

> [Tyson] would hire somebody, a Hispanic person, for second shift debone.
> We would run them through the I-9 process and the Basic Pilot, determine
> that we felt like they were legally working in the United States.  They would
> go to work and then a night or two or three nights down the line, at some point
> before too long, [Snead] would fire that person, tell them that they weren't
> doing their job and just send them home.  But she wouldn't notify – she'd get
> their badge, okay.  And she would not notify personnel that she had terminated
> that person.  And then she would bring in somebody who was not legal to work
> in the United States and she knew and was getting paid to do this.  And then
> when they would get there she would give them the first person's, the legal
> person's badge, and then they would work as that person.

Furthermore, Tilton testified, Phillips informed him of allegations that Albertville management

had instructed workers to list a least seven dependents on their W-2's and that Snead had refused

to allow Hispanic workers on her shift to bid on job openings.  On this point, Haynie observes,

Tilton's testimony directly conflicts with Phillips's testimony.[11]

---

[11] Following a recess in his deposition, the court notes, Tilton further testified:

Witness: Before we go on, can I clarify something?  You were asking about how did I find out
about the allegations that we were requiring Hispanics to put down seven dependents or something
else.  What was it?  Really unrelated to immigration, but I said I thought I heard that from Jerry.
He's telling me that's not true.  I really don't know how I heard.  I just know that it was brought
up.  It was not – it was not part of my focus because how many people - I mean, there's nothing to
gain for Tyson Foods for me to tell you to put down seven dependents.  It doesn't make any
difference to Tyson Foods that I know of why it would.  You just get to bring home a little more
money.  And on the job bidding, we have a contract.  And the contract says this is whole job
bidding, and there is a grievance procedure for it.  We don't go to jail for that.  We might go to
arbitration, but we don't go to jail for it.  I wasn't concerned with those things, though.  What I
was concerned with was the allegations that Vicki was bringing in illegal folks and giving them
somebody else's ID and allowing them to work without us being aware of it.  And that's really
why I was here.  It if had been those other things, I wouldn't have made the trip.
*Q: So you remember hearing those allegations?*
A: I remember someplace.  Maybe some notes I read or something.
*Q: But Mr. Phillips told you, I guess during the break, that he didn't tell you that.*
A: Yeah.

*See* Pl. Ex. 8, at 64-65.

Walker, Phillips, and Light met with plaintiff, who repeated her allegations.[12]  Light

testified that Haynie mentioned Janet Steele as a knowledgeable party.[13]  Walker decided to

perform a "paycheck audit" of second shift employees working for Snead and informed Tilton

the audit would take place the next day, October 25, 2001, which was also the day Haynie

received a positive employee evaluation from Snead as overall "meets expectations."[14]  Tilton

traveled to Albertville to be present for the audit.[15]  During the audit, second shift debone

employees had to provide their Tyson picture identifications and sign to pick up their

paychecks.[16]  According to Light's deposition, 130-135 employees were subjected to the audit,

of which approximately 15-20 (approximately 16%) were deemed "suspicious" by Tilton and

Walker.  Phillips testified that none of the "suspicious" employees was working using someone

else's identification card; rather, according to Phillips, the suspicion arose from the signatures as

_____

[12] These allegations were that Snead was firing team members then bringing in illegal aliens to work using their Tyson identification cards, Tyson's nurse was signing off on physicals for illegal aliens that she was not performing, and Snead's husband was obtaining false documentation for illegal aliens working at Tyson.  Tilton testified to being informed of the first but not the third allegation (contrary to testimony by Light and Phillips). When asked about the second allegation, i.e., whether Tilton was told that a Tyson nurse was filling out physicals that were never done, Tilton replied: "Yes. There was a nurse. I don't recall the nurse's name. It was supposedly – I'm not sure exactly what it was she was supposed to be doing. There was a nurse mentioned." *See* Pl. Ex. 8 at 62.

[13] Light's deposition indicates Light spoke with Steele *after* the investigation into Haynie's report had been completed but neither took notes nor required Steele to provide a written statement.

[14] Weaver testified that "meets expectations" is a good rating, while "meets and exceeds expectations" is the highest rating. Def. Ex. 9, at 49.

[15] Tilton testified: "The management team was aware this time I was coming and why because they're the ones that instigated it." Tilton did not interview Haynie but claims he spoke with Snead and informed her of the nature of the allegations against her. Regarding the October 2001 investigation, Tilton testified, he also discussed the allegations, investigation, audit and findings "amongst the management team; Ricky Walker, Jerry Weaver, Jerry Phillips, Cindie Light, myself."

[16] At this audit, the in-person signature was compared to the signatures on the employee's application, I-9 documents, and Tyson ID. Similarly, the employee's photo identification was compared to the face of the person picking up the paycheck and the photograph contained in the employee's personnel file.

well as the fact that approximately three of four Social Security cards appeared to have been signed by the same person. Light testified that of these suspicious employees, 6 were terminated while seven others were suspended "pending proper other documentation being brought in relating to their identity . . . ." Light did not recall whether any of the suspended employees returned with proper documents. Light testified that she was unaware of any discipline meted out by Tyson to Tyson employees for this incident. Light did not investigate whether or not Snead was providing false credentials to Hispanic workers and cannot recall if Snead was ever asked if she provided false credentials.[17]

According to Walker, some of the suspicious employees admitted that they were illegal aliens and had purchased their work documentation, and Tyson immediately terminated those employees. Also according to Walker, none of the illegal aliens admitted to purchasing their false documentation from Snead or anyone at the Albertville complex. Other suspicious employees were suspended until they could provide further identification, but these employees never returned to Tyson and their employment was terminated.

After the October 2001 investigation, Phillips testified, he informed Snead of the allegation that "there were some people up there at the plant making fake ID's and charging people for fake ID's," to which Snead responded in disbelief. Phillips denied that Haynie, Light, Steele or another Tyson employee reported to him: that Tyson personnel were instructing Hispanic employees to list seven or more dependents on their W-2's to avoid withholding of certain taxes; that Hispanic employees were not allowed to bid on certain posted jobs; and/or that

_____

[17] Light testified that Tilton, Walker, Weaver, or Phillips would have been the ones to handle any questioning of Snead.

Snead had threatened to terminate Hispanic employees who did bid on open jobs or moved from her shift. *See* Pl. Ex. 5, at 58-59.

Haynie's opposition to summary judgment relies upon the testimony of Janet Steele, who was hired by Tyson in April 1999 as a second shift quality control employee and later promoted to an hourly supervisor position in 2nd shift debone.[18]  Steele testified that she believed Snead was engaging in unlawful employment practices based on the following: (1) during the time when Tyson was withdrawing from a practice of staffing positions through temporary service agencies and converting properly documented temporary employees to full-time status, Snead told Steele to let two putative illegal Hispanic employees come to Snead if they had difficulty obtaining papers[19]; (2) in the process of taking new employees to the nurse's office to pick up necessary paperwork for hearing tests, Steele asked the nurse why Hispanic employees were given two forms (stapled together) for hearing tests and was told that one of the forms was in the name the Hispanic employee used when he worked at the Albertville plant as a temporary employee and the other form was in a different name the same employee would be using to work full-time;[20] and (3) Steele encountered two Hispanic employees, both named Pedro, who shared the same social security number, which she reported to both Stuart Howell and Snead.

Furthermore, Haynie points out, Steele testified to personal knowledge of Tyson's

---

[18] Haynie's opposition to summary judgment states: "Steele's deposition is so voluminous (over 400 pages) that it is impossible to set forth all the pertinent facts in this brief.  Specifically, there is no way to catalog for the Court all of the allegations relayed by Steele to Tilton, Phillips and Walker during the October 2001 investigation.  Counsel has done his best to point the Court in the right direction."

Although the court recites some of Steele's testimony, it concludes that her testimony is generally irrelevant to any issue in this case except, <u>possibly</u>, as related to matters involving seven dependents and not allowing Hispanics to bid on open jobs.  Most of Steele's testimony would not be admissible at a trial.

[19] From Steele's perspective, Snead's comment indicated an intent to help workers acquire false credentials.

[20] Steele testified that she reported this dual-name situation to management member Stuart Howell.

12

unlawful employment and immigration practices regarding Yepez. Prior to October 2001, Steele stated, she received an after-10:00 p.m. phone call at home from Yepez,[21] who informed Steele that a Tyson employee had asked Yepez to come to the plant so he could be hired. Yepez wanted Steele to drive him to the plant that evening, which Steele believed to be a mistake since Tyson hiring was supposed to stop at 9:00 p.m. When Steele called the plant to see if they were waiting on Yepez, someone at the plant answered "yes," and Steele then drove Yepez to the plant.

Steele further testified that she accompanied Yepez to an office to get his picture made. According to Steele, in the presence of Steele, Snead, and Weaver, an HR clerk took at least three pictures of Yepez and affixed the photos to a Tyson ID, an ID of Snelling Personnel,[22] and an ID of Quality Foods (an Albertville business), respectively. Next, Steele stated that Weaver asked Snead, "Is he coming to work?", to which Snead replied, "He'll be here tomorrow night." According to Steele, the Snelling and Quality Foods cards were phony IDs meant to establish the required employment references for Hispanic employees at the plant. At that point, Steele further testified, Yepez was told to state that he had worked at both those places if asked. Steele also testified that she saw Snead and Weaver look at the HR clerk as she was making the two phony ID cards. From then on, Steele testified, she assumed that Tyson knew that illegal employees worked in the plant.

While Steele denied involvement in the June 2001 investigation of illegal employment and immigration practices at Tyson, she participated in the October 2001 investigation by

---

[21] Steele testified that Yepez was the brother or cousin of Steele's then-boyfriend.

[22] Haynie has attached a copy of the Snelling card as Exhibit 2.

meeting with Phillips, Tilton, and Walker on October 26, 2001 and informing them of the above-listed immigration-related incidents.  According to Steele, she also informed Phillips, Tilton and Walker that Snead did not allow Hispanics on her shift to bid on open jobs and threatened to fire them if they did so.  At the October 26 meeting, Steele stated, she informed the group that she could get four Hispanic employees of Tyson to provide affidavit testimony that they purchased false identification from Snead, but Walker never pursued this avenue.[23]

Weaver testified to having no knowledge at the time of plaintiff's October 2001 allegations and no involvement in the October 2001 investigation by Tyson corporate. According to Walker, because no evidence linked Snead to the false documentation, Walker determined that Haynie's allegations about Snead could not be substantiated.  However, as a result of information gathered during the investigation, Walker and Tilton concluded that Snead was highly unpopular with employees and needed to work on her people skills.  Tilton recommended that Snead be placed on the first shift where Tyson could better supervise her, and Walker instructed Weaver to make this happen.[24]  Weaver informed Snead that he did not want to receive any further complaints regarding Snead's people skills and that she could be demoted if things did not improve.

Around this time, Weaver testified, Weaver received complaints from Burger King, one

---

[23] Contrary to Steele's assertions, Walker testified,  "[Steele] told Jerry Phillips and myself that she could give us names of people that were there working illegally but she never would bring them into the office because Jerry had told her that we would terminate them if they were there illegally."
See Pl. Ex. 9. at 38.

[24] Haynie highlights Walker's testimony that more upper management members worked on first shift than second shift.

of Tyson's customers, regarding bone levels in Tyson's chicken.[25]  Weaver testified that the

biggest problem in Debone was the lack of teamwork between Snead, Haynie, Zawaski and

Ethel Lacount.  According to Weaver, he had observed Haynie, Zawaski, and Lacount not

working well with new team members or teaching them how to debone but instead gossiping

with QA technicians and/or complaining about working with Snead.

On November 9, 2001 (two weeks after Haynie's report of illegal employment practices

and Tyson's "investigation"), Weaver met with Snead, Haynie, Zawaski and Lacount in order to

encourage them to work as a team and, as Weaver put it, "put [their problems] to rest."  Light

prepared a meeting summary of the meeting, entitled "Problems in the Debone Area."  Haynie

deems this memo "proof of an almost immediate retaliatory response to Haynie's October 2001

report of illegal employment practices," relying upon the following parts of the memo: (1)

Weaver's specific order to debone employees to only report complaints about Snead to Weaver

or Light (paragraph 7);[26] (2) Weaver's specific reference to calls to Tyson "800 numbers" and

written complaints to the Tyson Corporate office (paragraph 9);[27] and (3) the second and final

---

[25] Neither party has pointed to additional evidence in the record regarding Burger King's alleged problems with Tyson bone levels.

[26] Plaintiff contends: "This command is in direct contradiction to the reporting procedures of Tyson's Harassment Policy."  The court provides the exact wording of the November 9, 2001 memo:

> Jerry Weaver stated that if Vickie was abusing them or hollering at them or anyone
> else, he wanted to know about.  He assured everyone that he would take care of the
> problem.  He told everyone present that he would not tolerate anyone being abused,
> yelled at or mistreated.
> [Weaver] stated that if anyone had a problem with Vickie or any decisions that she made, that they were to
> discuss it with either Cindie Light or himself and not be running from one to the other gossiping and back
> stabbing.

[27] Plaintiff draws the court's attention to Light's testimony that Tyson had only two "800 numbers" at this time – one of which was the Ethics Hotline.  The court recites the relevant portion of the memo: "Jerry Weaver stated that anyone can call the 800 numbers or write letters to the Corporate office but until we get to the point of working together as a team we aren't going to accomplish anything.  He stated that it takes each and everyone

page of the memo, which stated:

> Jerry Weaver asked each person present if they understood and he asked if they
> had any questions or comments . . . . Dana Haynie did not respond . . . . During
> this meeting everyone, except for Dana, was attentive and listening to Jerry's
> comments. Dana was slouched in her chair. She sat with her arms crossed
> and gave very little eye contact Jerry or anyone else in the room. At times she
> would bite her finger nails and look around the room.[28]

Weaver stated that he told the gathered employees that Snead was their superintendent and had

been instructed to treat them with respect. He told them if they had problems with Snead, he

wanted to know about it personally.

According to Walker, the "mumbling and grumbling" problems at issue in the November

9, 2001 memo related to the allegations of unlawful employment and immigration practices.[29]

---

working together as a team to overcome the problem."

> Plaintiff then argues:

> Read in conjunction with paragraph seven, a reasonable interpretation of this paragraph
> is that Weaver is again trying to circumvent Tyson's Harassment Policy by dissuading
> employees from reporting complaints (whether orally via the Hotline or in writing) to the
> corporate office. Additionally, this paragraph can be reasonably interpreted as providing
> proof that Weaver knew full well about: (1) the June 2001 anonymous Hotline call concerning
> Snead and Light; (2) Tilton's June 2001 investigation; (3) Haynie's October 23 or 24, 2001
> complaint of illegal employment practices; and (4) the "investigation" that ensued. Certainly,
> Weaver's knowledge of these actions can be inferred from this explicit paragraph.

[28] According to Haynie, this part of the 11/9/01 memo shows Tyson's intend to "single out" and
"personally attack" her less than two weeks after her complaint which uncovered at least thirteen illegal Hispanic
workers. Haynie testified that she was attentive at the meeting and looking at Weaver. However, Haynie admits she
may have been slouched in her chair, biting her fingernails, and looking around the room. In the court's view,
ascribing this general concern about problems (which the plaintiff herself acknowledges existed) to retaliation is a
total stretch.

[29] The court provides relevant excerpts of Walker's testimony in this regard:

*Q: Let me show you [the November 9, 2001 memo] and ask if you're familiar with that document?*
A: Yes.
*Q: What is it?*
A: This is where Jerry [Weaver] and Cindie [Light] met with the ladies that were working in debone
about a lot of the talk and murmurings that were going on, and Jerry just wanted to put an end to that.
*Q: Had you been advised about a problem in debone? The talk and murmurings that you were talking
about, had anybody told you about that?*

Walker did not recall ever being told that Haynie had filed a formal harassment complaint against Snead, although he testified that as complex manager, he would want to know if one of his superintendents had been accused of harassment.

According to Weaver, while Zawaski and Lacount responded positively at the meeting, Haynie's poor attitude and lack of teamwork "escalated." Weaver testified as follows: salaried supervisors complained to Weaver that Haynie was missing from her department for long periods of time; supervisors informed Weaver that plaintiff was often in the QA office or the orientation training room when she was supposed to be working on her line; Haynie's hourly team leaders complained to Weaver that plaintiff was not working with them; QA complained to Weaver that the bone levels on plaintiff's line were increasing; and the QA manager, the HACCP coordinator, and other supervisors complained about Haynie's negative attitude, failure to get involved with her line, and tardiness. Weaver testified that Haynie's attitude did not improve, that she continued to second-guess decisions of her superiors, and that she still

--------

A: Well, all of these allegations from the illegals being there had been going on for six months or so, so yes, I knew about the general conversations and the allegations and all the murmurings.
*Q: Were the murmurings that you're talking about related to the illegal allegations?*
A: Some of it, yes.
*Q: What did you understand? How were they related?*
A: I do know that Vicki was accused of providing illegal documents, and that was my main objective was to see if she was. And if she had been, she would have been terminated . . . .
. . . .
*Q: Were some of the murmurings that you've talked about concerning Vicki Snead and the allegations?*
A: Yes.
*Q: Do you know who was doing those murmurings? People working in debone?*
A: Probably Janet Steele and Dana were the only two that came directly to me and told me that they felt like Vicki was providing documents to illegal workers. I don't recall any of the other ladies there on that list coming directly to me, but I knew the group that was talking.
*Q: The people listed on [the November 9, 2001 memo], is that the group that was talking?*
A: Yes.
*See* Pl. Ex. 9 at 49-52.

The court notes that the November 9, 2001 meeting was attended by Vickie Snead, Dana Haynie, Kathy Zawaski, Ethel Lacount. *See* Pl. Ex. 5.

17

complained about supervisory decisions.  Walker also commented to Weaver that he had seen a marked change for the worse in Haynie's attitude.

According to Weaver, he asked the shift manager to speak with Haynie about staying in her department but still did not see any improvement in her attitude or performance.  Another supervisor supposedly informed Weaver that he heard plaintiff say in front of other team members and supervisors that she didn't have to work in this "F-ing" place, and that she "could go find her a damn job somewhere else."  Haynie has admitted that she told Weaver's secretary, Gayle Hinton, that she hated Tyson and coming to work.[30]  On November 26, 2001, Haynie was five hours late for work and did not call in to the plant.

On November 27, 2001, Weaver and Phillips met with Haynie and Snead to discuss plaintiff's attitude problem, and Phillips took notes.  Weaver wanted Haynie to turn her attitude around "and be the supervisor she was capable of being."  Weaver gave Haynie time off with pay for working extra hours as a superintendent and asked her to determine, during the paid leave, whether she wanted to continue working at Tyson.  Weaver informed Haynie that he wanted to see her return with a positive attitude.[31]

Weaver testified that he observed no improvement in Haynie's attitude or performance after the two November meetings.  Haynie again gave no notice to Tyson when she was absent, even though she had been given a second copy of Tyson's call-in procedures.  Weaver testified

_____

[30] In her deposition, while plaintiff admits telling Gayle Hinton that she hated work and dreaded coming to work every day, Haynie points out that she also told Hinton and Snead (in the same conversation) that she was depressed and had to go to the doctor.  *See* Def. Ex. 1 at 199-200.

[31] While the November 27, 2001 meeting memo indicates that Weaver gave Haynie the opportunity to transfer to second shift and Haynie refused, Haynie testified that she did not remember Weaver offering to transfer her to second shift.

that Haynie's team members and peers in Debone informed Weaver that Haynie did not seem to

care and refused to get involved in the supervision of the department in December and January.

Weaver met with Walker and Phillips to discuss demoting Haynie, and Weaver decided to

demote plaintiff to an hourly position (which Walker approved). On February 27, 2002, Haynie

was assigned to an hourly position in the First Processing Department on first shift, which

represented a one-step demotion from salaried supervisor/"team leader."

In February 2002, while on FMLA leave,[32] Haynie reported to Light that Snead was

harassing her.[33] On February 12, 2002, Haynie met with Light about the allegations and gave her

written notes regarding the alleged harassment.[34] Light testified that Haynie accused Snead of:

(1) "going behind her and moving people off her line to other lines"; (2) not "allow[ing] her to

---

[32] Haynie took FMLA leave between February 4 and February 25, 2002. Haynie identified depression caused by work-related stress as a reason for this leave. Specifically, Haynie testified: "*Q: Well, I'm asking you whether the doctor gave you a diagnosis of the cause of your depression.* A: From stress. *Q: Okay. And you told him about your mom?* A: Yes. He knew about my mother, but at this point in time, my mother was not that sick." *See* Def. Ex. 1, at 239-240.

[33] As a human resource manager, Light was charged with investigating harassment complaints. Light testified as follows to the investigative procedure applicable to harassment complaints: (1) Open an investigation file (which Light testified was to be opened for every harassment complaint); (2) Interview the complainant; (3) Have the complainant complete a "complaint form"; (4) Instruct the complainant to prepare a written statement; (5) Review an investigation checklist with the complainant; (6) Review the complainant's written statement; (7) Talk to the alleged harasser; (8) Obtain a written statement from the alleged harasser; (9) Obtain the names of witnesses to the alleged harassment; (10) Interview any witnesses; (11) Get written statements from any witnesses; (12) Forward the investigation filed to Phillips, the complex HR manager at Albertville, to determine the necessary discipline; and (13) Provide Phillips with a "history" of past discipline meted out by Tyson for harassment.

Tilton's deposition largely echoed this investigation protocol but also added steps, e.g., telling the complainant and the accuser the outcome.

[34] According to Tyson, the notes Haynie provided to Light do not reflect allegations of sexual harassment or harassment due to Haynie's reports of alleged immigration and employment violations. Furthermore, Tyson contends, any Title VII claim based on this alleged "harassment" fails as a matter of law, since no reasonable person would have concluded that the "harassment" plaintiff complained about was a violation of Title VII. Further, Tyson observes, there is no evidence that Walker and Weaver had any knowledge of Haynie's allegation of "harassment" at the time the demotion decision was made.

do her own paperwork as far as FMLA's and job bids"; and (3) "yelling and hollering at her."[35]

Light opened an investigation file for Haynie's harassment complaint, which consisted of a

complaint form and written statement.  Furthermore, Light testified, she reviewed the required

checklist with Haynie,[36] talked to Snead, and gave Phillips "a copy of the notes [Haynie] gave

[Light] as far as her claim against where she was being harassed."[37]  Most importantly, Haynie

argues, Light failed to require Snead to give a written statement, did not talk to or obtain written

_____

[35] Light testified that Tyson's harassment policy forbids "yelling and hollering" at employees.  The policy
reads:

> It is the policy of Tyson Foods to provide a work environment that is free of unlawful harassment
> and discrimination.  We will maintain a strict policy prohibiting any kind of unlawful harassment,
> such as that involving race, sex, religion, age, national origin, veteran's or disability status.  This
> policy prohibits harassment in any form, including verbal, written, visual, or physical harassment.
> It also prohibits retaliation for complaining about this unwelcome conduct.
> The EEOC defines sexual harassment as: unwelcome sexual advances and requests for sexual favors
> (Quid Pro Quo harassment), and other verbal or physical conduct of a sexual nature that interferes
> with your ability to do your job (Hostile Environment harassment).
>
>     . . .
>
> Retaliation is making any employment decision against an individual because of their opposition
> to a discriminatory or harassing practice or conduct in the work place or their participation in a
> complaint against such unlawful practices.  Retaliation against those who report harassment and/or
> discrimination or refuse to submit to such conduct is forbidden.  Any supervisor who is found to
> have committed retaliation will be terminated.

*See* Pl. Ex. 4.

[36] Haynie asserts the checklist's significance in her case, citing Phillips's deposition:

> *Q: In each case that comes to human resources by way of harassment complaint, do you follow that*
> *checklist?*
> A: If it is deemed to be a harassment complaint, yes, that checklist is followed.
> *Q: Who makes the decision whether or not it's a harassment complaint?*
> A: Usually either [Light] or myself.

[37] According to Light, she gave Phillips a copy of Haynie's complaint and told Phillips she "would check
into it."  Haynie argues that Light never investigated further.  Light further testified that she did not know if Snead
was disciplined as a result of the "investigation." but knows that prior to Haynie's February 2002 complaint, other
employees had lodged similar complaints about Snead "hollering and yelling at them."

statements from witnesses,[38] and failed to make a recommendation based on disciplinary history

at Tyson.  Haynie further contends:  "[S]ince Light admits that she followed the checklist, and

the undisputed testimony is that the checklist is followed when a complaint is deemed a

harassment complaint, there can be no argument but that Haynie's February 2002 complaint

against Snead was deemed by Tyson to be a harassment complaint."

Haynie also notes Light's testimony about Tyson's anti-retaliation policy.  According to

Light, Tyson has "zero tolerance for retaliation."  In her deposition, Light deemed ". . . an

increase . . . or change in someone's corrective action once a complaint is filed . . ." as one

example of retaliatory conduct.  Phillips's testimony, Haynie asserts, confirmed that Tyson's

retaliation policy protects employees from retaliation for filing internal complaints of unlawful

employment practices and further confirmed the steps that must be taken when investigating

internal complaints.  Phillips testified to an additional step:  "After everybody's interviewed and

all the statements are taken, I always send a copy to Jerry Tilton, and we will sit and talk about

the case."  Phillips also testified to uncertainty about whether Haynie filed an internal

harassment complaint.  Phillips acknowledged knowing that Haynie felt she was being harassed

by Snead.  Phillips denied seeing Light's investigation file on Haynie, knowing what Light and

Haynie discussed, interviewing Snead, or taking part in any investigation concerning Haynie's

internal complaint.

From February 27, 2002 until June 12, 2002, Haynie worked in an hourly position in the

evisceration department.  Beginning on June 12, 2002, Haynie took extended FMLA leave from

which she did not return.  Haynie resigned on August 13, 2002, and plaintiff contends that she

---

[38] Light testified that she was sure she asked Haynie for the names of witnesses to the alleged harassment.

was "constructively discharged" as of that date. According to plaintiff's deposition testimony, her resignation letter contains all the reasons for her resignation.[39] However, Tyson argues, this letter does not mention sex discrimination, retaliation, or any report of Title VII discrimination or FLSA violations. *See* Def. Ex. 3.[40]

## PROCEDURAL HISTORY

Haynie filed this lawsuit on January 8, 2003, alleging the following: gender discrimination in violation of Title VII and 42 U.S.C. § 1981 (Count I), retaliation in violation of Title VII and 42 U.S.C. § 1981 (Count II), and retaliation in violation of the Fair Labor Standards Act ("FLSA") (Count III).[41] On March 19, 2003, Tyson moved to dismiss plaintiff's asserted § 1981 claims of sex

---

[39] Specifically, Haynie's deposition reads: "*Q: And am I right that [the nine-page resignation letter is] a complete statement of the reason you were quitting? A: Yes.*"

[40] While neither party describes the contents of Haynie's resignation letter, and the letter is a bit confusing at times, this court notes a few of the allegations contained therein:

- Haynie's February 28, 2002 salary check was wrong;
- Haynie's FMLA hours were put in the computer for leave taken while a salaried supervisor. "I have never known this to have been done to another salaried person.";
- Management stood around in evisceration watching Haynie work;
- Haynie filed an EEOC complaint on March 13, 2002;
- On March 14, 2002, the plant manager came to Haynie's area and made the superintendent move the team member training Haynie;
- Haynie was not allowed to go through a daily exercise program for her hands for all new hires;
- Although there was too much help in evisceration on May 8, 2002, plaintiff was not allowed to go to Debone like several other employees;
- On May 21, 2002, Haynie was written up for running in the plant but she observed others running who allegedly were not written up.
- On May 23, 2002, Haynie asked an hourly supervisor to take her place because of breathing difficulties, but the supervisor never came back;
- When Haynie's mother called because of dangerous high blood pressure, Haynie never received the message;
- Haynie applied for jobs she did not get;
- On June 28, 2002, Haynie didn't receive a paycheck. Although Tyson said she would get two the next pay period, the check was further delayed.
- Haynie suffered a number of physical ailments while in evisceration, including trouble with her hands and her breathing.

[41] Haynie seeks, among other things, declaratory and injunctive relief, damages, and attorney's fees.

22

discrimination and retaliation. On May 1, 2003, the court issued an Order dismissing with prejudice Haynie's § 1981 sex discrimination claim while reserving ruling on § 1981 retaliation.[42] Defendant now moves for summary judgment on Haynie's remaining claims of Title VII sex discrimination, Title VII retaliation, § 1981 retaliation, and FLSA retaliation.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory

---

[42] This court's May 1, 2003 memorandum opinion stated: "In view of the fact that this is a 'developing' area and the further fact that the substantive elements of a Title VII claim and a § 1981 claim are indistinguishable when appropriate, it makes sense to reserve ruling until trial. In the absence of some clear holding by the Eleventh Circuit or the Supreme Court to the contrary, the court will likely, ultimately, disallow the § 1981 retaliation claim."

allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer,* 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## I.   **Defendant's Motion**

### A.   **Introduction**

Tyson asserts generally: no genuine issues of material fact exist; Haynie cannot satisfy her *prima facie* burden to show that Tyson engaged in discriminatory/retaliatory conduct; even if she could satisfy her *prima facie* burden, she cannot rebut Tyson's legitimate, non-discriminatory and non-retaliatory reasons for its employment decisions; the Eleventh Circuit has not recognized a § 1981 retaliation claim based on the complaints of a non-minority employee about treatment of minority co-workers; Haynie's various retaliation claims all fail as a matter of law because Haynie did not engage in protected activity under these statutes; Haynie has not established a *prima facie* case of disparate treatment; Haynie fails to establish constructive discharge; the constructive discharge claim falls outside the scope of her EEOC charge; Haynie's FLSA retaliation claim fails as a matter of law because she did not complain to Tyson about alleged wage or hour violations; and the after-acquired evidence doctrine limits

24

Haynie's claims for damages in this matter.

Tyson calls Haynie's lawsuit "a classic example of a plaintiff trying to adjust the facts to fit a cognizable legal argument." Clearly, Tyson argues, from the first day that Snead began working on Haynie's shift, Haynie had extensive problems working with Snead. Furthermore, Tyson argues, Haynie's initial reports to Tyson management about Snead (in October 2001) involved charges of obtaining false documentation for and/or hiring illegal aliens. Tyson contends that the Title VII, § 1981, and FLSA claims contained in Haynie's complaint are inapplicable to the facts of this case. According to Tyson, Haynie has attempted to modify the complaints she made to Tyson, describing them as being "on behalf of Hispanic workers." Tyson states: "It is entirely unclear how getting an illegal alien fired amounts to asserting claims on behalf of that worker."

**B.    Plaintiff's Title VII Sex Discrimination Claims**[43]

Tyson asserts that plaintiff has failed to establish a prima facie case of sex discrimination and has failed to rebut Tyson's legitimate, nondiscriminatory reasons for its employment decisions. To establish disparate treatment because of gender, Tyson argues, Haynie must provide either direct or circumstantial evidence of discriminatory intent. *See Harris v. Shelby Co. Bd. of Educ.*, 99 F.3d 1078, 1083 (11th Cir. 1996). Since there is no direct evidence or statistical proof of sex discrimination in this case, Tyson contends, Haynie must use circumstantial evidence to make her *prima facie* case. Tyson argues that *McDonnell Douglas*'s burden-shifting test applies. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04

---

[43] The complaint alleges that Haynie was subjected to Title VII sex discrimination "with regard to hiring, compensation, benefits, training, supervision, evaluations, job assignments, promotions, demotions, discipline, discharge and other terms, conditions and privileges of employment . . . ." Compl. ¶ 20.

(1973)(requiring plaintiff to show a *prima facie* case of discrimination, defendant to produce a legitimate, nondiscriminatory reason for the employment decision, and plaintiff to then establish that the reasons for the employment action were pretextual).

### 1.   <u>Demotion</u>

Regarding her demotion, Tyson contends, plaintiff has provided no evidence of a similarly-situated male employee treated more favorably.  A Title VII *prima facie* case requires the following:  (1) plaintiff belongs to a protected group; (2) plaintiff was subjected to adverse job action; (3) plaintiff's employer treated similarly situated employees outside plaintiff's classification more favorably; and (4) plaintiff was qualified to do the job.  *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  According to Tyson, the plaintiff bears the burden of identifying a similarly-situated employee who is outside her protected class.  *See Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989).  The comparators must be similarly situated "in all relevant respects," and failure to show the existence of a similarly situated employee renders summary judgment appropriate where no other evidence of discrimination is present.  *See Holifield* at 1562, 1567.

Further, Tyson argues, "in order to be considered 'similarly situated' for purposes of proving a prima facie case, an employee allegedly receiving lesser or no discipline than the plaintiff <u>must have been involved in or accused of the 'same or similar misconduct' and operated under the same workplace rules or policies.</u>"  *See Dent v. Fed. Mogul Corp.*, 129 F. Supp. 2d 1311, 1314 (N.D. Ala. 2001)(emphasis added)(citation omitted).  According to Tyson, the following Eleventh Circuit test applies:

> In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or

accused of the same or similar conduct and are disciplined in different ways . . . The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed. (internal quotations and citations omitted) . . . . We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.

*See Maniccia v. Brown*, 171 F.3d 1364 (11th Cir. 1999)(emphasis added).

Plaintiff's EEOC charge, defendant contends, generally alleged that "male employees" at Tyson are "not subjected to adverse terms and conditions of employment," but fails to identify a specific male comparator.  Furthermore, Tyson argues, Haynie has only identified one male employee that she alleges was treated more favorably with regard to demotion — Steve Liverett. When Steve Liverett was demoted from a superintendent job, Haynie claims, he was returned to an hourly supervisor job, unlike her demotion from a supervisor job to an hourly laborer job in the First Processing Department.  Tyson asserts that plaintiff cannot establish that Liverett was similarly situated to her in all relevant respects; in fact, Tyson notes, Haynie testified that she had no information about Liverett's demotion and did not known whether Liverett's demotion was comparable to her situation.

Instead, Tyson argues, the evidence establishes that Liverett was treated exactly the same as plaintiff with regard to his demotion, even though (unlike Haynie) he was exhibiting a positive attitude and trying to perform his duties.  Tyson contends that Liverett was demoted one job level, from superintendent to salaried supervisor/"team leader."  Tyson points out that Haynie was only temporarily performing the task of superintendent during Blackmun's medical leave and never received an official promotion.  Tyson argues that Haynie's continued attitude and performance problems occurred after Blackmun returned to work and plaintiff returned to a salaried supervisor/team leader position.  In fact, Tyson contends, plaintiff testified that she

27

returned to team leader position when she came back to work after being given some paid time off on November 27, 2001. Thus, Tyson argues, plaintiff (like Liverett) was also demoted one job level.[44]

Even assuming plaintiff has established a *prima facie* case, Tyson argues, Haynie has failed to rebut Tyson's legitimate, nondiscriminatory reason for her demotion, as required by *Holifield*. According to Tyson, Weaver counseled Haynie on two occasions in an attempt to improve her attitude and teamwork, including at a meeting on November 9, 2001 between all the Debone supervisors and Snead. Weaver testified that he received positive responses from all the salaried supervisors at the November 9, 2001 meeting except Haynie.[45] Tyson repeats Weaver's testimony regarding complaints from co-workers about Haynie, the meetings where he discussed those complaints, and the facts surrounding Haynie's demotion.[46] In support of plaintiff's Title VII claims, Tyson argues, Haynie has offered no evidence that sex was a motivating factor in her demotion, that any Tyson decision maker ever made a derogatory statement about women, or that a similar-situated male employee who committed the same offenses as plaintiff was treated more favorably.

_____

[44] Tyson also criticizes Haynie's deposition testimony indicating that David Dahlke and Doyle Matthews would be proper comparators for her sex discrimination claims. Regarding Dahlke, Tyson asserts the following: there is no evidence that plaintiff was demoted because she was on medical leave, Dahlke continued to perform his supervisory duties during the time his son was in the hospital (either at the plant or via telephone and computer); Dahlke was never placed on official leave pursuant to Tyson's policy; and Dahlke's situation occurred in June 2001, nine months prior to plaintiff's filing of an EEOC charge. Regarding Matthews, Tyson asserts, Matthews never returned from surgery leave because he died. Furthermore, Tyson notes, Matthews leave occurred in March 2002, after plaintiff resigned her employment at Tyson. (The court notes that Tyson overemphasizes the occurrence times.) In her opposition to summary judgment, the court further notes, Haynie does not appear to rely upon Dahlke or Matthews as comparators.

[45] Haynie admits that she may have been "slouched in her chair," "biting her fingernails," and "looking around the room" during the November 9th meeting.

[46] These facts are detailed earlier in the memorandum opinion.

### 2.      Failure to Promote

Haynie's opposition brief states: "With regard to Haynie's sex discrimination claim based on allegations of denied promotions, Haynie agrees with Tyson that the same is to be dismissed.  As such, Haynie consents to the dismissal of this claim, and this claim alone." (Emphasis added).  Therefore, the court finds it unnecessary to summarize Tyson's arguments in this regard.

### C.      Plaintiff's Title VII Retaliation Claim[47]

According to Tyson, Haynie has failed to establish a prima facie case, to establish any causal connection between the alleged protected activity and adverse employment action, and to rebut Tyson's legitimate, nondiscriminatory reasons for its employment decisions.

Tyson enumerates the requirements of a *prima facie* retaliation case under Title VII: (1) Haynie participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between Haynie's participation in the protected activity and the adverse employment action."  *See Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000)(emphasis added).  Tyson argues that "protected activity" is defined by 42 U.S.C. § 2000e-3(a), which prohibits discrimination against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII]["the opposition clause"], or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this title [the "participation clause"]."  Since plaintiff had not begun EEOC proceedings in October 2001, when she complained about the alleged

---

[47] Defendant readopts and realleges arguments presented in its March 19, 2003, motion to dismiss and accompanying submissions.  This court incorporated those arguments in its May 1, 2003 memorandum opinion partially denying Tyson's motion to dismiss.

hiring and treatment of illegal aliens, Tyson argues, she cannot base her retaliation claim on the

"participation clause." *See EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir.

2000).[48]

To meet the requirements of the opposition clause, Tyson asserts, plaintiff must show that

she "had a good faith, reasonable belief that the employer was engaged in unlawful employment

practices." *See Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311-12 (11th Cir. 2002)(citation

omitted). Such reasonable belief, Tyson argues, must be both subjective and objective and

involve alleged violations of Title VII. Tyson relies upon the following passage from *Little v.*

*United Tech., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997):

> We previously have recognized that a plaintiff can establish a prima facie
> case of retaliation under the opposition clause of Title VII if he shows that
> he had a good faith, reasonable belief that the employer was engaged in
> unlawful employment practices. (Citation omitted). It is critical to emphasize
> that a plaintiff's burden under this standard has both a subjective and an
> objective component. A plaintiff must not only show that he *subjectively*
> (that is, in good faith) believed that his employer was engaged in unlawful
> employment practices, but also that his belief was *objectively* reasonable in light
> of the facts and record presented. It thus is not enough for a plaintiff to allege
> that his belief in this regard was honest and bona fide; the allegations and record
> must also indicate that the belief, though perhaps mistaken, was objectively
> reasonable.

Tyson details the facts and holdings in *Weeks*. There, the plaintiffs were terminated for

refusing to sign arbitration agreements covering employment discrimination claims. The

defendant argued that this refusal was not statutorily protected because plaintiffs could not have

---

[48] Tyson contends that the only alleged adverse employment actions following plaintiff's original EEOC charge in March 2002 were two coaching/counseling statements: one for returning late from a break (dated April 9, 2002) and one for running in the plant (dated May 21, 2002). *See* Pl. Ex. 5. Counselings or "coaching statements" do not support a retaliation claim, Tyson contends, since Haynie unquestionably committed the offenses mentioned. Further, Tyson argues, plaintiff has not offered probative evidence of similarly situated comparators who were treated more favorably than Haynie after committing similar infractions. Finally, Tyson notes, there is no evidence that Supervisor Sue Stephens, who counseled Haynie, knew that Haynie had filed an EEOC charge in March 2002.

reasonably believed that requiring employees to sign the arbitration provisions constituted an unlawful employment practice under the statutes. Tyson draws the court's attention to *Weeks's* holdings: (1) that the plaintiffs did not have an objectively reasonable belief that their employer was engaged in an unlawful employment practice since the Supreme Court had previously held such arbitration provisions were legal; and (2) "[T]he plaintiffs may not stand on their ignorance of the substantive law to argue that the belief was reasonable. As we previously stated, '[i]f the plaintiffs are free to disclaim knowledge of the substantive law, the reasonableness inquiry becomes no more than speculation regarding their subjective knowledge.'" *Id.* at 1317 (quotation omitted). The Eleventh Circuit determined that the plaintiffs had not alleged *prima facie* cases of retaliation under Title VII, the ADEA, or the ADA. *Id.* The *Weeks* court further held that since the arbitration agreement did not violate these statutes, it could not support a retaliation claim under those statutes. Tyson equates Haynie's argument in this case to the argument rejected by the Eleventh Circuit in *Weeks*. According to Tyson, plaintiff's reports to Tyson in October 2001 about Snead's alleged assistance to illegal alien workers are clearly not covered by Title VII.

Tyson relies upon the definition of "national origin" set forth in *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973): "the country where a person was born, or, more broadly the country from which his or her ancestors came." In *Espinoza*, Tyson contends, the Supreme Court held that discrimination on the basis of national origin does not encompass claims grounded upon the citizenship status of a particular individual. *Id.* at 91-92.[49] Thus, Tyson argues, any allegation regarding the illegal residency status of a Tyson worker is not protected under Title VII.

---

[49] Tyson also cites *Fortino v. Quasar Co.*, 950 F.2d 389 (7th Cir. 1991) for this proposition.

Tyson contests Haynie's depiction of her reports to Light as asserting rights <u>on behalf of</u> <u>Hispanic workers</u>.  According to Tyson, Haynie testified that her report to Light in February 2002 concerned Snead fighting with undocumented workers about job bids.  Haynie testified that Snead had a yelling match with one employee, "Samuel," in which Snead allegedly told Samuel if he moved to first shift she would fire him for being an illegal alien.  Haynie further testified that Samuel replied with a threat to turn Snead in as the person who gave him his false documents.  Haynie also testified that the reason she went to Light with this report was because she was concerned about Samuel's legal status to work – not, Tyson argues, the ability of Hispanic workers to bid on jobs.

Haynie also stated that she complained to Light about job bids and Doreen Romero ("Romero").  However, Tyson contends, plaintiff testified that whatever issue Romero had with job bids was resolved as Romero "eventually came to first [shift], but I can't remember in which job. She had gotten nearly every job in debone over a period of a year that I was doing the superintendent's job.  She had signed to do every job and got it."  While Haynie allegedly reported issues regarding Tyson's compliance with the job bid requirements of the labor agreement, Tyson notes, her reports were not on "behalf of" Hispanic employees but rather stemming from her concern that two Hispanic employees had received preferential treatment, i.e., a move to first shift because of childcare issues that violated the collective bargaining agreement.[50]

---

[50] The court provides the text of Haynie's amended EEOC charged dated September 27, 2002:

I reported to Ricky Walker, Complex Manager, that Vicky Snead had told the hispanic employees that if they came to their scheduled shift, first shift, that they would be terminated.  No non-hispanic employees at Tyson Foods were treated in this manner. Further, hispanic employees were instructed in their federal tax withholding forms

Tyson also argues that Haynie has not demonstrated a causal connection between any protected activity and the adverse employment action, i.e., demotion. Timing alone, Tyson contends, is generally insufficient without more to prove the requisite causal connection. *See Booth v. Birmingham News Co.*, 704 F. Supp. 213 (N.D. Ala. 1988). Tyson points to plaintiff's testimony that no Tyson employee ever acted angry with Haynie for her reports or told Haynie she shouldn't have made such reports. According to Tyson, only Walker, Tilton, and Phillips even knew Haynie was involved in the investigation of alleged illegal alien workers. Further, Tyson observes, plaintiff has opined that Tyson's response to her complaint was prompt, professional, and effective in identifying and terminating illegal aliens working at Tyson. Plaintiff testified that she did not know of any Tyson management employee who was disciplined for what Haynie reported. In Haynie's notes, Tyson contends, she reports that Light responded "don't worry about it. That's my job" when Haynie expressed concern that the report about illegal aliens "caused [Light] extra trouble."

Tyson notes that Weaver, one of the demotion decision makers, testified to being unaware of either Haynie's complaints to Light about Hispanics being denied job bids and being instructed to claim more federal income tax exemptions, or the October 2001 investigation that

---

to list at least seven (7) dependents, so as no federal tax would have to be withheld from their pay. On information and belief, non-hispanic employees were not told how to fill out their federal tax withholding forms. Further, on information and belief, Tyson's hires hispanic employees under the age of 18 years without having the proper work permits. Tyson's does not hire non-hispanic employees under the age of 18 to work at its Albertville facility. Further, on information and belief, hispanic employees were not allowed to participated in the job bid process at the Tyson's facility in Albertville. Non-hispanic employees were allowed to participate in the job bidding process. I reported these violations to my supervisors and subsequently was retaliated against in violation of Title VII of the Civil Rights Act of 1964.

*See* Def. Ex. 3.

33

followed Haynie's complaints.[51]  Tyson then highlights plaintiff's testimony: "When I reported

the hiring of illegal aliens, they commenced to start procedures in terminating me."  Even if the

court finds a prima facie case of Title VII retaliation, Tyson argues, Haynie has failed to show

that defendant's legitimate, non-retaliatory reason for its employment decision is pretextual.[52]

### D.   Plaintiff's FLSA Retaliation Claim

The FLSA anti-retaliation provision makes it unlawful

> to discharge or in any other manner discriminate against any employee
> because such employee has filed any complaint or instituted or caused
> to be instituted any proceeding under or related to this chapter, or has
> testified or is about to testify in any such proceeding, or has served or
> is about to serve on an industry committee.

29 U.S.C. § 215(a)(3)(emphasis added).[53]

To demonstrate a prima facie case of FLSA retaliation, Tyson contends, Haynie must

show: "(1) she engaged in activity protected under [the] act; (2) she subsequently suffered

adverse action by the employer; and (3) a causal connection existed between the employee's

activity and the adverse action."  *Id.* at 1342-43 (quoting *Richmond v. ONEOK, Inc.,* 120 F.3d

---

[51] On p. 28 of Walker's deposition, this court notes, Walker testified that in the course of the October 2001 investigation at Tyson he was not aware of allegations that Snead encouraged Hispanic workers not to bid on open jobs and that Tyson management employees instructed Hispanic workers to list at least seven dependents on their W-2's.  Walker's testimony does not appear to indicate whether Walker knew of those allegations at the time he decided to demote Haynie.  Furthermore, pp. 27-28 of Weaver's deposition (cited on p. 30 of defendant's original brief and p. 10 n. 24 of defendant's reply brief) do not appear to support the contention for which they are cited.  However, on p. 36 of Weaver's deposition, Weaver testified that in October 2001, he was unaware of Haynie's allegations of illegal immigration practices.  Weaver's deposition then skips from p. 36 to p. 49.

[52] Facts pertaining to Haynie's alleged deteriorating job performance have been detailed earlier in this memorandum opinion.

[53] Defendant cites *Wolf v. Coca-Cola Co.,* 200 F.3d 1337, 1342 (11th Cir. 2000)("The FLSA protects persons against retaliation for asserting their rights under the statute.")(Emphasis added).

205, 208-09 (10th Cir. 1997)(emphasis added).  Here, Tyson argues, plaintiff cannot prove that she engaged in any activity protected under the FLSA.  *See Snapp v. Unlimited Concepts, Inc.*, 208 F.3d 928, 930 (11th Cir. 2000)( "The FLSA requires, *inter alia*, employers to pay covered employees a minimum wage, and to provide additional compensation for overtime work.  29 U.S.C. § 215(a)(1) specifies minimum rates of compensation, and section 207(a)(1) requires employers to pay employees 'at a rate not less than one and one-half times the regular rate' of pay for any time spent working in excess of forty hours per week.)

In her deposition, Tyson argues, Haynie admits she never complained to anyone at Tyson regarding wage and/or hour issues.[54]  Regarding Haynie's report about illegal aliens not being permitted to bid on certain first shift jobs, Tyson contends, job bidding is not protected by the FLSA.  Furthermore, Tyson argues, Janet Steele testified that individuals who were working on second shift and bidding on first shift jobs were earning more on second shift due to a shift preferential.  *See* Pl. Ex. 1, at 275-76.  Tyson then cites to the portion of Haynie's deposition

---

[54] The pertinent portion of Haynie's deposition provides:

> *Q: Okay.  And did you ever complain to anyone at Tyson about whether an employee was getting paid minimum wage?*
> A: No sir.
> *Q: Did you ever complain to any person at Tyson about whether any employee was getting paid overtime premium in accordance with the law?*
> A: We had some problems with pay when people worked over.  But it was just a couple of occasions, you know, where they said my people didn't work, and they did work.  And then we'd have to go in to the conference room and have a big meeting.
> *Q: But that's not what you're complaining about in this case, is it?*
> A: No.
> *Q: You don't think anybody did anything to you because y'all had an overtime issue, do you?*
> A: No.

where Haynie's counsel explained the basis of Haynie's FLSA claim.[55]

Additionally, Tyson argues, plaintiff has failed to establish a causal connection between any protected activity and her demotion. *See Wolf*, 200 F.3d at 1343 ("In demonstrating causation, the plaintiff must prove that the adverse action would not have been taken 'but for' the assertion of FLSA rights.") Tyson also argues that a temporal relationship standing alone is insufficient to show a causal relationship supporting a retaliatory discharge claim. *See Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).[56] Here, Tyson contends, Haynie cannot establish evidence of a retaliatory motive or that "but for" the retaliation she would not have been demoted. Tyson repeats that none of the Tyson decision makers (Walker or Weaver) had knowledge of her alleged "FLSA complaints."

Finally, Tyson concludes that Haynie has failed to rebut Tyson's legitimate, non-discriminatory reasons for its employment actions towards her. Tyson's arguments to this effect

---

[55] The cited portion of Haynie's deposition reads:

*Mr. Smith: Okay. Can you tell me what it is I ought to be asking about in connection with wage and hour?*
Mr. Carr: Well, our theory is – I think she's covered the majority of it – is the fact that several of the Hispanic workers went though the job bid process or attempted to go through the job bid process to get higher paying jobs. Most of the Hispanics at the plant were not in the union, they were not afforded Union protection. Vickie Snead was the person over first shift who had – who they were trying to go work for who had the higher-paying jobs, and she threatened them and told them that if they accepted those jobs, that she would have them terminated. And she, in fact, had them sign papers apparently saying that she [*sic*] did not want the jobs. Ms. Haynie reported that to management. And our theory in regard – in relation to that complaint as well as the other complaints you've covered, she was retaliated against by her job change; her harassment with her employers, Vickie Snead in particular; the memos that we've seen; the disciplinary notes that we've seen; the demotion; and her ultimate constructive termination. That's the two-minute gist of our theory.
*Mr. Smith: All right. Is there any other aspect of the case that falls within the FLSA?*
Mr. Carr: It focuses on, in our view, the suppression of job – job-climbing by the Hispanics, getting better-paying jobs, the suppression of wages by not allowing them to get the better-paying jobs to the bid process, and the keeping of their wages at a minimum wage level by Vickie Snead not allowing them to get those jobs; that's the – it's – that's what it's related to.

[56] The *Stone* court found: "[M]ere temporal proximity between the filing of the charge and the action alleged to have been taken will rarely be sufficient in and of itself to create a triable issue."

36

have already been noted.

## II.   Haynie's Response

### A.   Plaintiff's Title VII Sex Discrimination Claims

#### 1.   Demotion

Haynie agrees with Tyson's characterization of her burden of proof to establish a *prima facie* case of Title VII sex discrimination with regard to her demotion.  However, Haynie argues, she has met that burden and established a *prima facie* case.  According to Haynie, Tyson has not disputed that the evidence clearly shows three elements of the test, i.e., that Haynie belongs to a protected class; that she was subjected an adverse job action (being demoted from salaried supervisor to hourly general laborer); and that she was qualified to do the job.  The only disputed element, Haynie contends, is whether a similarly situated employee outside her classification was treated more favorably.

Her demotion on February 27, 2002, Haynie argues, represents the only instance in the history of Tyson's Albertville facility where an employee has been demoted from a salaried supervisor position to a general laborer line position.  According to Haynie, "I am the only salaried supervisor ever been demoted to a line position." *See* Def. Ex. 2, at 49.  Haynie contends that the "perfect comparator" for her claims is Steve Liverett, who in October 2002 was demoted from superintendent to salaried supervisor because Liverett, according to Phillips, was unable to perform the extra responsibilities of the job.[57]

---

[57] Haynie contends:

Like [Haynie], [Liverett] was a high level, salaried member of management, who was demoted for a totally subjective reason (he could not do the job and she supposedly had a bad

37

Furthermore, Haynie asserts, she has sufficiently demonstrated pretext.  Haynie argues that Tyson's differential treatment of Liverett and Haynie is in itself enough to show pretext. Additional evidence of pretext, Haynie contends, includes Walker's testimony that Haynie was demoted due to a conflict with Snead rather than a bad attitude: "Well, the decision to demote Dana and to get her out of the debone department, because at that time we had moved [Snead] into first shift and she was the superintendent and Dana was a supervisor working for Snead. That created a lot of conflict."  Haynie also relies upon numerous signed statements from Tyson employees attesting to Haynie's good attitude, which "serve to completely eviscerate Tyson's stated (and now disproven) reason for Haynie's demotion." *See* Pl. Ex. 10.[58]

---

attitude).  The situations cannot be any more closer [*sic*].  It is abundantly clear that Liverett was treated more favorable to [*sic*] Haynie.  Stated differently, although he was demoted for the same type of subjective reasons, he was allowed to remain a manager.  Any decrease in his authority, job duties, pay and benefits was minimal at best.  Liverett went down one step – Haynie went down to the bottom of the barrel. In fact, the position she was demoted to was lower in prestige and pay than the job she held in 1999.

[58]  The court provides a sampling of these statements:

To Whom It May Concern;
     In my opinion Dana Haynie had a positive outlook on her job.  She was concerned about the bone levels when they got high.  She helped the team members in Debone when they needed help.  When they done good she would tell them what a good job they done.  She always had a positive Attitude about how she could improve on things that needed to be done.
               Nancy Hampton

To Whom It May Concern:
     Donna Haney [*sic*] was a very concerned supervisor about her job responsibility.  She corrected the problem when we had to [*sic*] many bones she went to the front of the line to correct the problem with the Wing Cuters [*sic*].  Our bone level was the lowest She always gave praise about good job performance it was a pleasure to come in and work with Donna.
               Sheketla McGhee

In Reference to Dana Haynie
•     With Dana, there was never a negative, only a positive attitude at work.
•     As our line supervisor as well as a debone supervisor Dana cared greatly about not only the quantity but also the quality of the product produced.
•     The only thing Dana ever asked of anyone was that he or she did their job and

38

### 2.   **Promotion**

Haynie consents to the dismissal of any Title VII sexual discrimination claim based on failure to promote.

### B.   **Plaintiff's Section 1981 and Title VII Retaliation Claims**

The Eleventh Circuit, Haynie contends, clearly recognizes a § 1981 retaliation claim. *See Webster v. Fulton County, Georgia,* 283 F.3d 1254, 1256 (2002). *See also Foley v. University of Houston Sys.,* 2003 WL 751183 at * 4 (5ᵗʰ Cir. (Tex.) Haynie argues that this claim must be analyzed under the same principles that apply to Title VII retaliation cases. Haynie asserts that she meets the elements of proof for a Title VII (and section 1981) retaliation claim because: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected activity. *See Taylor,* 84 F. Supp. 2d at 1254.

Haynie contends that her October 2001 complaints of unlawful employment and immigration practices qualify as protected activity under the applicable standard, i.e., that plaintiff must show "a good faith, reasonable belief that the employer was engaged in unlawful employment practices."[59] While Haynie admits that some of her complaints in October 2001

---

performed it to the best of their ability. But because of the good disposition of all
co-workers, we all tried to give her 110%.

Robert Brown

[59] *Taylor* stated:

A plaintiff engages in "statutorily protected activity" when he or she protests
an employer's conduct which is actually lawful, so long as he or she demonstrates
"a good faith, reasonable belief that the employer was engaged in unlawful
employment practices." However, it is insufficient for a plaintiff "to allege [her]
belief in this regard was honest and bona fide; the allegations and record must
also indicate that the belief, though perhaps mistaken, was objectively reasonable."

may have been directed strictly toward illegal immigration practices, "there is testimony in the record that other portions of her complaints dealt specifically with the discriminatory treatment Hispanic workers suffered."  Haynie again argues that Light does not remember (and thus cannot deny) Haynie's reports that Tyson management instructed Hispanic workers to list seven dependents on W-2 forms, that Snead refused to let Hispanic employees bid on open jobs, and that Snead threatened to terminate Hispanics who did bid on open jobs.  While Phillips denies learning of such reports, Haynie argues, Tilton testified that Phillips told Tilton about two of these three allegations.[60]

According to Haynie, a factual question exists concerning the content of Haynie's reports to Tyson management, since Haynie's, Light's, and Tilton's testimony demonstrates that Haynie did complain about discriminatory treatment of Hispanic employees.  Further, Haynie asserts, "[S]ince the testimony establishes that this conduct was directed only towards Hispanic employees, there can be no serious dispute but that clear questions of race, color or national origin discrimination was, in fact, raised by Haynie."  Such evidence, Haynie contends, establishes both the subjective and objective prongs of the required test and shows that Haynie participated in statutorily protected activities.

Haynie lists the following alleged retaliatory employment actions taken by Tyson.  After making the October 24, 2001 complaint, Haynie asserts, Weaver held a November 9, 2001 meeting with Debone supervisors entitled "Problems with the Debone Area."[61]  On November

---

[60] *See supra* note 11.

[61]   Haynie repeats her allegations surrounding the November 9, 2001 memo, detailed earlier in this memorandum opinion.

40

27, 2001, Haynie contends, she was counseled regarded a "newly discovered negative attitude." On December 12, 2001, Haynie argues, she was singled out and issued a memo dealing with procedures for calling in to work.[62] In February 2002, after Haynie filed a harassment complaint against Snead, both Light and Phillips violated company policy in handling this complaint, and nothing was done to further investigate the matter. On February 27, 2002, while on FMLA medical leave, Haynie was demoted from salaried supervisor to hourly laborer, thereby (according to Haynie) becoming the only management member to ever be demoted from a supervisory position to general laborer. Then, Haynie argues, she was constructively discharged on August 13, 2002. Haynie notes that she had never been disciplined by Tyson prior to making her October 2001 complaint and in fact received an "excellent evaluation" from Snead on October 25, 2001. Based on the foregoing facts and arguments, Haynie asserts, she has established sufficient evidence of causal connection and pre-text to survive summary judgment.

## C.   Plaintiff's FLSA Retaliation Claim

Haynie concludes, without further elaboration: "The evidence and argument outline in this brief, particularly with regard to Haynie's other retaliation claims, establishes that genuine issues of fact exist that defeat [the] motion for summary judgment with regard to this claim."

_____

[62] The December 12, 2001 memo, the court notes, is addressed to "Superintendents, Managers, Supervisors, Team Leaders" and states:

> Effective immediately, anyone who is going to be out of work will be required to report <u>directly</u> to your department superintendent, shift manager or plant manager.  Do not leave a message with the guard or other personnel, speak directly to *one of the above* mentioned persons.
> Calling someone and leaving a message, as some people have been doing in the past, will not be acceptable.  Supervisory personnel and team leaders should set a good example for team members on attendance.

*See* Pl. Ex. 5, Tyson 00066.

III.   **Defendant's Reply**[63]

Tyson begins with the following observations: Haynie's brief exceeds the court's prescribed page limit, without the court's permission; Haynie did not give an overview of Weaver's (the demotion decision maker's) or her own deposition testimony; Haynie makes no mention of Steele in the argument section of her brief; "Steele's wild assertions [listed in the facts section of Haynie's response] are not relevant to any of Plaintiff's claims"; Haynie is attempting to distract the court, since her true complaints are that she could not get along with Snead, her supervisor, and thought Tyson was hiring illegal aliens.

A.   **Plaintiff's Title VII Sex Discrimination Claims**

Tyson notes that Haynie expressly dismissed her previously asserted claim of sex discrimination based on promotions, leaving only a Title VII claim based upon Haynie's demotion from salaried supervisor to hourly team member.  Importantly, Tyson contends, Haynie has not provided evidence of a male employee similarly situated in all material respects to Haynie who was treated more favorably than Haynie.  Tyson again argues that Steve Liverett (the comparator designated by plaintiff) is <u>not</u> similarly situated to plaintiff in all relevant respects.  According to Tyson, it is undisputed that Liverett (who was demoted from a superintendent position to salaried supervisor) displayed a good attitude and tried to perform all job duties; on the other hand, Tyson argues, Weaver testified to receiving negative reports from Tyson employees about Haynie's attitude problems and refusal to perform job duties, Haynie was late to work without calling in on November 26, 2001, and Haynie admitted to a co-worker

_____

[63] The court notes that Tyson repeats many arguments from its initial summary judgment submission.  The court does not repeat all of these arguments.

42

that she hated Tyson and coming to work.[64]  Tyson restates *Maniccia*'s holding that the quantity

and quality of the comparator's misconduct must be nearly identical to plaintiff's to prevent

second-guessing of employer's business decisions.[65]  Furthermore, Tyson argues, Haynie and

Liverett were treated the same, since both employees were demoted <u>one step down</u> in the Tyson

employment hierarchy.  Tyson also criticizes Haynie's assertions that she was the only

management employee in Tyson's history to be demoted from salaried supervisor to team leader.

Actually, Tyson argues, Haynie had no knowledge whether any Tyson salaried supervisors had

been terminated rather than demoted.[66]

Turning to Haynie's pretext-related arguments, i.e., plaintiff's prima facie case is strong

enough to establish pretext in and of itself, Complex Manager Walker offered an inconsistent

explanation for her demotion, and other employees stated the Haynie did not have a bad attitude,

---

[64] These facts are detailed earlier in this memorandum opinion.  Furthermore, Tyson contends, evidence of Haynie's poor attitude reflects directly on whether she was qualified to perform her job (an element of her *prima facie* case).  *See Peele v. Country Mutual Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002)(holding that because the plaintiff failed to demonstrate that she was meeting the company's legitimate employment expectations, she could not establish that she was qualified); *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997)("If the plaintiff has other evidence of discrimination, well and good; but if he has nothing else, and is therefore totally reliant on the *McDonnell Douglas* formula, he is out of luck if he can't show that he was meeting his employer's legitimate expectations.")

[65] Tyson criticizes Haynie's argument that she was treated differently than Liverett because his demotion kept him within the management circle while her demotion dropped her down to an hourly laborer position.  Tyson argues: "Plaintiff was employed by Tyson at the lowest level management position.  As such, any demotion would have resulted in her being placed in a team member position.  Moreover, Plaintiff's claim that she 'went to the bottom of the barrel' at Tyson has no support.  The fact that Plaintiff does not consider the position to be as 'prestigious' as her prior hourly team member position is irrelevant.  Plaintiff offers no evidence of an available position with more 'prestige and pay' into which Plaintiff could have been demoted."

[66] Tyson also notes Haynie's testimony that she only knew of three Tyson management employees who had been demoted: Haynie, Liverett, and a woman named Alma Ramirez (the latter two were demoted from superintendent to salaried supervisor).  Tyson argues: "The fact that Liverett and Ramirez were employed in the same position, demoted because of the same reason (performance problems) and were treated <u>exactly</u> the same with regard to their demotions provides no inference of discrimination and, in fact, rebuts Plaintiff's sex discrimination claim."

Tyson contends that none are sufficient.

First, Tyson asserts, Haynie has not even established a *prima facie* case, much less one strong enough to establish pretext.  Second, Tyson argues, Haynie's assertions regarding Walker's testimony are not supported by the evidence.  Tyson provides the following excerpt from Walker's deposition:

> *Q: When you were telling Jeff* [plaintiff's attorney] *about in February of 2002, as I understand it, Ms. Haynie was demoted and transferred to another department?* A: Yes. *Q: And she moved from debone to the evisceration department?* A: That's correct.  *Q: Explain to me the reason for her demotion from supervisor to hourly.*  A: The reason for the demotion was her general attitude and lack of effort toward her job.  The reason for her transfer to another department was just to get her away from Vickie Snead.

*See* Pl. Ex. 9, at 72-73.[67]

---

[67] The court notes additional relevant portions of Walker's deposition:

*Q: Did you and Mr. Weaver discuss demoting Dana Haynie?*
A: Yes.
*Q: Tell me when you and he discussed that.*
A: Well, it was prior to the demotion.  All that I recollect was that we needed to get her out of Vicki's department, which was debone.  So that's when we elected to put her in the evisceration department.
*Q: Why did you feel you needed to get Dana out of Vicki's department?*
A: Well, that's where a lot of the problems were coming from.  From all the ladies that were having a hard time getting along with Vicki.
*Q: What problems are you referring to?*
A: Just from [Vicki's] people skills or communication skills, her inability to deal with problems . . . .
*Q: And to deal with those problems, a decision was made to take Dana Haynie and put her in the evisceration department?*
A: Well, the decision was to demote Dana and to get her out of the debone department, because at that time we had moved Vicki into first shift and she was the superintendent and Dana was a supervisor working for Vicki.  That created a lot of conflict.
*Q: Did you make the decision to demote Dana Haynie?*
A: I was part of it.
*Q: Tell me what led to that decision.*
A: It was, like I said, Dana's, her attitude completely changed.  She quit communicating with people, and she was always outgoing, real bubbly when she came down the hallways, and you know, anyone could see an immediate change.
*Q: Was any consideration given to moving Dana to a lateral job in another department?*
A: No.
*Q: Why not?*
A: Well, it was just a total change in her attitude and her work ethic that changed.  I felt like that it was just resentment to Vicki, but I didn't you, you know, that that was all of it.  Because like I said,

Third, Tyson contends, plaintiff's submissions of co-worker statements are inadmissible hearsay and cannot be considered in opposition to defendant's motion for summary judgment. Tyson has filed a contemporaneous motion to strike this evidence as inadmissible hearsay and as unauthenticated evidence.[68]  Even if the court were to consider these statements, Tyson argues, they do not prove pretext, since there is no evidence that any of the employees notified Tyson management of their opinion regarding Haynie's attitude and also no evidence to dispute that Weaver received complaints about Haynie from other employees.  Tyson argues that these co-workers' generalized statements of Haynie's performance do not establish pretext.  *See Peele v. Country Mutual Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002)(finding in ADEA case that "[G]eneral statements of co-workers, indicating that a plaintiff's job performance was satisfactory, are insufficient to create a material issue of fact as to whether a plaintiff was meeting her employer's legitimate employment expectations at the time she was [demoted].");  *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994)("Our cases . . . give little

---

Dana had worked in different departments before and never displayed, you know, that kind of attitude in front of me so . . . .

*Id.* at 58-59.

[68] In its motion to strike, Tyson relies upon the Eleventh Circuit's pronouncement in *Macuba v. Deboer*, 193 F.3d 1316 (11th Cir. 1999):

The general rule is that inadmissible hearsay "cannot be considered on a motion for summary judgment."(citation omitted).  In considering hearsay, the Eleventh Circuit has held: "[A] district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be 'reduced to admissible evidence at trial' or 'reduced to admissible form.'(citations omitted) . . . . For example, the statement might be admissible because it falls within an exception to the hearsay rule, or does not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted), or is used solely for impeachment purposes (and not as substantive evidence).

Tyson has also moved to strike Pl. Ex. 2, which appears to contain Yepez's Alabama driver's license(s), Snelling personnel services/Quality Foods badge(s), and a social security card.  The court is unable to accurately discern all the text or photographs on these documents, due to photocopying deficiencies.

45

weight to statements by supervisors or co-workers that generally corroborate a plaintiff's own perception of satisfactory job performance.")

### B.    Plaintiff's Section 1981 and Title VII Retaliation Claims

Regarding Haynie's § 1981 retaliation claim, Defendant reminds the court of its statement in the January 2003 memorandum opinion: "[i]n the absence of some clear holding by the Eleventh Circuit or the Supreme Court to the contrary, the court will likely, ultimately, disallow the § 1981 retaliation claim." Tyson contends that there has no been no clear holding to support Haynie's position.[69] Furthermore, Tyson argues, § 1981 has no opposition clause similar to Title VII's. Moreover, Tyson contends, even should this court recognize Haynie's § 1981 retaliation claim, it should fail based upon Tyson's analysis for a Title VII retaliation claim (see below).

Regarding Haynie's Title VII retaliation claim, Tyson first argues that Haynie has not established a prima facie case. Tyson points out the "strange" fact that Haynie does not offer her own testimony as to what she reported to Light and other Tyson management but rather states that Light does not recall Haynie's reports (and therefore cannot deny them.)[70] Tyson contends:

---

[69] Tyson addresses the two cases Haynie cites to support her § 1981 retaliation claim, *Webster v. Fulton County Ga.*, 283 F.3d 1254 (11th Cir. 2002) and *Foley v. Univ. of Houston Sys.*, 324 F.3d 310 (5th Cir. 2003). According to Tyson, *Webster* is dissimilar to the instant case. There, the Eleventh Circuit concluded:

> [A]n independent contractor . . . states a claim for violation of section 1981 when that contractor - a contractor that is qualified to do the work upon which it bids – alleges that a governmental entity refused to award a contract to the contractor in retaliation for the contractor's filing of a lawsuit charging the governmental entity with a custom or policy of disparate-treatment racial discrimination that was applied against the contractor in violation of Section 1981.

Tyson further notes that *Foley* is a Fifth, not Eleventh, Circuit case.

[70] Tyson adds: "Providing evidence that a witness does not recall something is not the same as a plaintiff carrying her burden of establishing by substantial evidence that she engaged in a protected activity."

46

"Because Plaintiff fails to offer any testimony establishing that she actually made reports to Tyson of alleged practices prohibited by Title VII, she cannot establish a prima facie case of retaliation."

Regardless, Tyson argues, Haynie's alleged reports to Light (that Tyson management instructed Hispanics to list multiple dependents on their W-2 forms and that Snead would not allow Hispanics to bid on jobs and threatened to terminate them if they did bid on open jobs) do not encompass activities prohibited by Title VII. Addressing the W-2 tax withholdings issue, Tyson argues, this report was not made on "behalf" of Hispanics. Tyson argues: "It certainly is not detrimental for an employee to have a lesser amount in taxes withheld from his paycheck. Further, even if Plaintiff made this report on "behalf" of Hispanics, it is not a report of discriminatory practice prohibited by Title VII, and Plaintiff has no reasonable basis on which to believe that it is protected by Title VII."

Turning to Haynie's alleged reports about job bids, Tyson contends that these reports concerned either illegal aliens (not Hispanics) or Hispanics who had received preferential treatment.[71] Tyson again contends that illegal aliens are not a class protected by Title VII. Tyson repeats parts of Haynie's deposition to prove that Haynie's reports were "regarding Snead fighting with illegal aliens about job bids – not Hispanics." Specifically, Tyson repeats that Haynie allegedly reported that Snead had a yelling match with an employee named "Samuel," in which Snead allegedly told Samuel if he moved to first shift she would fire him for being an

---

[71] Tyson emphasizes the following parts of plaintiff's deposition testimony: the information reported to Light regarding job bidding was contained in Exhibit 34 (Haynie's handwritten notes), and the written notes which encapsulate her report to Light is "a collection of notes about the legal status of immigrant workers." *See* Def. Ex. 2, at 111; Ex. 34 to Pl. Dep.

illegal alien, and that Samuel then replied to Snead that he would turn her in as the person who gave him his false identification. *See* Def. Ex. 2 at 75-77. Tyson also repeats Haynie's testimony regarding Doreen Romero: "[Romero] eventually came to first, but I can't remember in which job. She had gotten nearly every job in debone over a period of a year that I was doing the superintendent's job. She had signed to do every job and got it. But she did make it to first shift, yes." *Id.* (Emphasis added). Finally, Tyson contends, Haynie confirmed that her reports about Hispanic employees relating to Tyson's compliance with the job bid requirements of the labor agreement involved Haynie's concern that two Hispanic employees had received preferential treatment (getting to move to first shift because of childcare issues) in violation of the bargaining agreement. *See* Def. Ex. 2, at 113. Tyson reiterates that Complex Manager Walker and Plant Manager Weaver, who made the decision to demote Haynie, both testified that they had no knowledge of these allegations.[72]

Tyson then addresses Haynie's list of alleged retaliatory actions. Haynie's October 24, 2001 report to Light, Tyson repeats, did not cover any alleged activity protected by Title VII and thus cannot support a Title VII retaliation claim. Regarding the November 9, 2001 Debone meeting, Tyson characterizes the meeting memorandum differently than Haynie. According to Tyson, Weaver neither "ordered" employees to only report complaints about Snead to himself or Light nor told them not to use the hotline; instead, Weaver simply told the Debone team leaders that he wanted to know about such complaints personally. Tyson also counters Haynie's assertion that Weaver's reference to "800 numbers and written complaints to the Corporate office" indicated Weaver's knowledge of Haynie's complaint to Light. According to Tyson,

_____

[72] *See supra* note 51.

"Since it is undisputed that Plaintiff never made a hotline complaint and never sent a written complaint to the corporate office, no inference can be drawn between Weaver's statement and Plaintiff's alleged report to Light.  The undisputed evidence establishes that Weaver, who made the decision to demote Plaintiff, had no knowledge of her complaints and no knowledge of the investigation stemming from her complaints."

Additionally, Tyson contends, the memo does not show that Weaver and others went to "great lengths to personally attack Haynie," as alleged in plaintiff's brief.  While Haynie denies that she responded negatively to Weaver in the meeting (and testifies she responded "quietly"), she also testified that she was mad during the meeting and possibly slouched in her chair, biting her fingernails, and looking around the room.  Regarding the  November 27, 2001 counseling, Tyson asserts that the counseling was based on continued reports to Weaver by salaried supervisors and team members of Haynie's absences from her department and failure to work with them.[73]  Regarding the December 12, 2001 memo, Tyson contends, while Haynie says she was singled out, she has failed to dispute that she committed the underlying wrong, i.e., not properly calling into work on November 26, 2001.

Turning to Haynie's February 2002 harassment complaint, Tyson repeats that the complaint did not say Snead was harassing Haynie because of her sex or any other protected classification, and that no reasonable person could conclude that the "harassment" alleged was a violation of Title VII.  Tyson deems this "harassment" complaint "nothing more than Plaintiff's continued questioning of decisions made by her supervisor and continued inability to get along with her coworkers."  Regarding the demotion, Tyson repeats its arguments in that regard.

_____

[73] Weaver's testimony in this regard has been discussed at length earlier in this memorandum opinion.

Regarding Haynie's reference to "constructive discharge" on August 13, 2002, Tyson argues, Haynie has not established the legal requirements for constructive discharge.[74]  Tyson also addresses Haynie's claim of receiving no prior discipline from Tyson but rather an "excellent evaluation."[75]  Plaintiff's satisfactory performance in the past is not the issue in this case, Tyson contends; rather, the question is whether Haynie was performing well at the time of her demotion.  *See Karazanos v. Navistar Intern. Transp. Corp.*, 948 F.2d 332, 336 (7th Cir. 1991). Here, Tyson argues, the evidence establishes that Haynie's job performance and attitude substantially deteriorated after she received her final performance review.[76]  Finally, Tyson contends, Tyson had a legitimate, non-discriminatory reason for demoting Haynie.

### C.   Plaintiff's FLSA Retaliation Claim

Tyson emphasizes Haynie's one-sentence response, arguing that Haynie has offered no evidence that she engaged in FLSA-protected activity, i.e., complaints about wage and/or hour issues.  Also, Tyson repeats, Haynie has not established the requisite "but for" causal connection required in an FLSA retaliation claim.  Finally, Tyson asserts, Haynie relies upon the same evidence of pretext given for her Title VII retaliation claim, which Tyson contends is

---

[74] A constructive discharge claim, Tyson argues, requires demonstrating a work environment "so intolerable that a reasonable person [in plaintiff's position] would be compelled to resign."  *See Kilgore v. Thompson & Brock Mgt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996)(citation omitted); *see also Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (2001)("The standard for proving constructive discharge is higher than the standard for proving a hostile environment.")  According to Tyson, Haynie has not established severe and pervasive harassment, much less the heightened constructive discharge standard.

[75] Tyson draws attention to the actual evaluation, "meets expectations," as opposed to Haynie's characterization of that evaluation as "excellent."  Tyson also points out that Snead, the alleged harasser, issued the evaluation on October 2001.

[76] Tyson's alleged facts to show Haynie's alleged "deterioration" in performance/attitude have already been addressed in this memorandum opinion.

insufficient.

## CONCLUSIONS OF THE COURT

Much of the "evidence" which the court has recounted is irrelevant to any purported claim in this case. Much would be inadmissible to support any claim of the plaintiff. Some might be admissible only to rebut plaintiff's alleged reasons for making complaints, etc.

The court notes that plaintiff's concerns about Vicki Snead appear to have begun before Snead became plaintiff's supervisor.[77] It may have related to a rivalry between the first and second shifts. These concerns were exacerbated when Snead was asked to assist plaintiff on the first shift while plaintiff was assuming some of the responsibilities of Blackmun.

The much-discussed evidence related to illegal aliens as such, including reports and complaints thereof, the investigation thereof, physical exams, false documentation, etc., is irrelevant to any claim in this case. The only marginal significant attaches to the evidence pertaining to causing Hispanics to list seven dependents and forbidding Hispanics from bidding on open jobs. It is highly questionable whether any such complaints related to concern about Hispanics or only to a desire to "retaliate" against Snead. It is further irrelevant that plaintiff felt bad about having to tell employees that they were terminated because of FMLA issues or that she was disliked because of it.[78]

It is further irrelevant, other than to show true concerns, that plaintiff objected to Snead being

---

[77] Plaintiff started making notes about Snead when Snead started to spend time on plaintiff's shift. Plaintiff told her supervisor, at the beginning, that Snead's assignment would cause trouble. This may have been influenced by the attitude of others toward Snead.

[78] While some of the "evidence" may well be inadmissible to support plaintiff's claims, it may be admissible to show what her real concerns were.

51

assigned to the first shift or that the assignment upset others on the first shift. Further, that plaintiff did not like being supervised by Snead and that she didn't get along with Snead does not support any of her claims. It is patently obvious that plaintiff's problems with Snead were not gender-related.

Plaintiff's criticism of the personnel practices of Light and others regarding not taking notes, not opening files, etc., has little, if any significance. As indicated above, Steele's testimony is mostly irrelevant and likely inadmissible, except, again <u>possibly</u>, as related to the seven dependents and forbidden bids evidence. Further, it is a total stretch to suggest that the counseling about the admitted hostility between Snead and others was somehow retaliatory against the plaintiff.

There is no question that defendant has articulated reasons for demoting the plaintiff. These include poor attitude, negativity, tardiness, etc. Plaintiff admitted that she generally hated her job for reasons likely unrelated to gender or retaliation. Much relates to alleged interaction with Snead. There is no federal law against overbearing supervisors or even harassment by supervisors if it is unrelated to a protected class or retaliation. There is no federal law against harassment per se. Plaintiff's complaint to Light in February 2002 with regard to yelling is not cognizable unless it is retaliatory as to protected conduct. Plaintiff's reasons listed in her resignation letter tend to belie rather than support her now-asserted claims.

Having conducted the usual process of winnowing through irrelevant "evidence" and attempting to ferret out the real issues, the court concludes as follows:

(1) The apparently mandatory constructive discharge claim is baseless. There is no reasonable inference of intolerableness – certainly none arising from cognizable claims. Merely being demoted, as such, is not intolerable. Merely not being able to get along with another employee is not legally intolerable.

(2) There is no reasonable inference of gender discrimination as to any claim. Such claim(s) border on being fallacious and frivolous.

(3) There is no reasonable basis for any retaliation claim except for the <u>possible</u> claim that there was retaliation based upon reporting about seven dependents and forbidding Hispanic employees to bid. Apparently such claims are, when appropriate, maintainable under Title VII and, possibly, under § 1981.[79] There is <u>no</u> basis for a FLSA retaliation claim.[80] The defendant's motion will, at this stage, be granted in part. The court will reserve ruling on one aspect of the retaliation claim(s) and require further briefing related thereto.

This ___23rd___ day of October 2003.

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**

---

[79] *See, however, Olmsted v. Emmanuel*, 783 So. 2d 1122 (Fla. Dist. Ct. App. 2001).

[80] Plaintiff's attorney's own statements belie such a claim.

53