IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

03 DEC 31  PM 2: 24

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| DANA J. HAYNIE | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Civil Action No.: 03-PT-0049-M |
| | ) |
| TYSON FOODS, INC., | ) |
| | ) |
| Defendant. | ) |

**ENTERED**

DEC 3 1 2003

## MEMORANDUM OPINION

This cause comes to be heard upon supplemental submissions to defendant Tyson Foods,

Inc.'s ("Tyson") Motion for Complete Summary Judgment, filed on August 28, 2003.

## FACTS[1] AND PROCEDURAL HISTORY

Haynie filed this lawsuit on January 8, 2003, alleging the following: gender discrimination

in violation of Title VII and 42 U.S.C. § 1981 (Count I), retaliation in violation of Title VII and 42

U.S.C. § 1981 (Count II), and retaliation in violation of the Fair Labor Standards Act ("FLSA")

(Count III).[2] On March 19, 2003, Tyson moved to dismiss plaintiff's asserted § 1981 claims of sex

discrimination and retaliation. On May 1, 2003, the court issued an Order dismissing with prejudice

Haynie's § 1981 sex discrimination claim while reserving ruling on the § 1981 retaliation claim.[3]

On August 28, 2003, Tyson moved for complete summary judgment on Haynie's remaining

---

[1] The court re-adopts and re-incorporates by reference the facts from its October 23, 2003 memorandum opinion.

[2] Haynie seeks, among other things, declaratory and injunctive relief, damages, and attorney's fees.

[3] This court's May 1, 2003 memorandum opinion stated: "In view of the fact that this is a 'developing' area and the further fact that the substantive elements of a Title VII claim and a § 1981 claim are indistinguishable when appropriate, it makes sense to reserve ruling until trial. In the absence of some clear holding by the Eleventh Circuit or the Supreme Court to the contrary, the court will likely, ultimately, disallow the § 1981 retaliation claim."

33

claims of Title VII sex discrimination, Title VII retaliation, § 1981 retaliation, and FLSA retaliation. On October 23, 2003, this court partially granted defendant's motion for summary judgment and dismissed all claims with prejudice, except "a possible Title VII and/or § 1981 claim based on retaliation for (only) complaints concerning whether Hispanics were told to list seven dependents and were not allowed to bid on open jobs." The parties' supplemental submissions on those limited issues are now before this court.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay*, 265

2

F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

**I.   Defendant's Supplemental Brief**

### A.   Failure to Establish Prima Facie Case of Title VII or § 1981 Retaliation

Enumerating the requirements for a prima facie case of retaliation under Title VII, *see Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000), Tyson again argues that Haynie has failed to show that she engaged in activity protected under the statutes. Tyson answers in the negative the question posed by the court in its October 23, 2003 order, i.e., "whether complaints motivated by concerns other than real concerns for the protected class are subject to retaliation claims." Tyson relies upon *Little v. United Technologies, Carrier Transicold Division*, 103 F.3d 956, 960 (11th Cir. 1997)(establishing that an employee seeking protection under the opposition clause of Title VII must have a "good faith, reasonable belief" that her employer has engaged in unlawful discrimination) and *Williams v. Russell Corporation*, 218 F. Supp. 2d 1283, 1296 (M.D. Ala. 2002)(holding "not only must the employee subjectively believe that she was the victim of unlawful discrimination, but an objective reasonable person under the same circumstances must be

3

able to reach the same conclusion.")[4]

Tyson further relies on *Spadola v. N.Y.C. Transit Authority*, 242 F. Supp. 2d 284, 292 (S.D.N.Y. 2003), in which the court rejected the plaintiff's retaliation claim based on his prior allegation of sexual harassment. In *Spadola*, Tyson argues, the plaintiff testified that he subjectively viewed his sexual harassment allegation not as a report of activity that violated Title VII but "as his own form of intimidation and retaliatory tactic designed to deter [his supervisor] from instituting disciplinary charges to punish his behavior." The *Spadola* court stated:

> The statute is designed to protect the rights of employees in good faith to protest discrimination they reasonably perceive they suffered, and to encourage reporting of serious offenses free from fear of reprisals . . . . In this framework, Congress could not have contemplated a contrary legislative scheme as a legitimate purpose of Title VII retaliation claims: to arm employees with a tactical coercive weapon that may be turned against the employer as a means for the asserted victims to advance their own retaliatory motives and strategies, and thereby extract employment concessions on account of minor social lapses or harmless infractions in the workplace, or even to escape appropriate disciplinary measures.

Tyson highlights the court's holding in *Spadola*, i.e., plaintiff did not demonstrate protected activity because plaintiff did not actually believe he had been a victim of sexual harassment at the time the alleged incident occurred, and the evidence demonstrated that his report of alleged sexual harassment was improperly motivated. *See also Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1187 (11th Cir. 1997)(stating that the participation clause provides wider protection than the opposition clause because the "opposition clause by its very nature focuses upon the motive of the employee, covering only one who 'has opposed' any practice which violates Title VII."(Emphasis

---

[4] Tyson contends: "In other words, a plaintiff must establish that her complaint was motivated by a good faith desire to oppose a discriminatory employment practice."

Furthermore, Tyson argues, courts have held that a plaintiff cannot have an objectively reasonable belief that an employment practices violates Title VII or § 1981 if there is no legal support for the claim. *See Harper v. Blockbuster*, 139 F.3d 1385, 1387-88 (11th Cir. 1998). According to Tyson, *Holt v. Lewis*, 955 F. Supp. 1385, 1387 (N.D. Ala. 1995) is analogous to the instant case. In *Holt*, Tyson notes, the plaintiff alleged that Samford University (his employer) retaliated against him because he "championed the cause of a woman student who was a victim of sexual harassment." However, the *Holt* plaintiff did not allege that the female student was discharged from employment, not chosen for employment, or otherwise denied any privilege of employment by the University. The district court determined:

> Framing the allegations of the complaint in the light most favorable to plaintiff, he has only asserted that a female student was being unfairly treated by an instructor and that his opposition to this treatment ultimately led to his constructive discharge. This in no way indicates any employment practice on behalf of Samford. Without more, any retaliation by defendants for plaintiff's advocacy of a student's rights is simply not prohibited by Title VII. <u>Because the plaintiff did not oppose a discriminatory action that is proscribed by the statue, plaintiff fails to state a claim of retaliation under Title VII, and defendants' motion is due to be granted.</u>

*Id.* at 1388 (emphasis added).[7]

_____

about a co-worker's offensive remark was a Title VII violation. Specifically, the Eleventh Circuit stated: "[b]y the terms of the statute . . . not every act by an employee in opposition to racial discrimination is protected. The opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual." The Eleventh Circuit concluded: "The record indicates that no rational jury could find [the plaintiff's] belief that his opposition to [his co-worker's] racial remark constituted opposition to an unlawful employment practice to be objectively reasonable." The Eleventh Circuit found plaintiff had failed to establish a *prima facie* case of retaliation.

[7] Additionally, Tyson contends, *Wimmer v. Suffolk County Police Dep't*, 176 F.3d 125, 134-35)(2d Cir. 1999) is instructive. In *Wimmer*, Tyson asserts, the plaintiff argued that because he (1) reported overhearing racial slurs made by co-employee police officers against black citizens and (2) questioned another police officer who stopped Hispanic motorists without cause, he was given poor evaluations and eventually terminated from the force. While the plaintiff had in fact complained about discriminatory conduct, the court determined plaintiff failed to offer evidence of unlawful discrimination with respect to the terms and conditions of employment at the police department, e.g., that police officers were subjecting other employees to discriminatory conduct. Based upon *Wimmer*, Tyson argues: "In other words, an employee is not afforded protection against retaliation simply because she reports an employment practice she believes is discriminatory – that employment practice must be recognized as

Here, Tyson asserts, Haynie has offered no legal authority establishing that her complaints about alleged instructions to Hispanic employees to withhold taxes involves a discriminatory employment practice prohibited by Title VII or § 1981, and thus those complaints cannot provide the basis for a legally cognizable retaliation claim.  Furthermore, Tyson contends, Haynie has not shown her subjective good faith belief that the alleged instruction to Hispanics was discriminatory. Tyson provides the following excerpt from Haynie's deposition: *"Q: Now, is this discrimination that favored the Hispanic employees or that hurt them?* A: Well, if they wanted to come to first shift, I guess it would hurt them.  *Q: I'm sorry.  We're talking about the seven dependents?* A: It favored them.  *Q: This discriminated in their favor?*  A: Oh, yeah.  *Q: So, that's not a complaint that they were being discriminated against, is it?*  A: No."

Turning to Haynie's bid-related allegations, Tyson admits that a plaintiff who establishes opposition to an employer's practice of denying Hispanic employees job bids is protected from retaliation under the statutes.  However, Tyson argues, the evidence clearly establishes that Haynie lacked a good faith reasonable belief that her alleged complaints regarding job bids were complaints of an employment practice that violated Title VII and § 1981, and Haynie also did not provide Tyson with sufficient information to establish that she was opposing discrimination.

Tyson relies upon a lengthy quote from Haynie's deposition testimony to show the context and exact language of Haynie's complaint to Tyson.  According to Tyson, this quote demonstrates that Haynie's complaint about job bids was "clearly . . . not regarding an employment practice prohibited by the statutes and . . . clearly did not sufficiently convey to Tyson that Plaintiff thought Hispanics were being subjected to a discriminatory employment practice regarding job bids."  The

---

discriminatory under the law in order to be the basis for a retaliation claim."

excerpt (in its entirety) reads:

Q: When did it – what did you say to [Light] in that conversation?
A: I told her that the people were approaching me wanting to know why they had not come to their bid jobs on my shift.  And I had told them that [Snead] give me a piece of paper that they had signed saying that they did not want the job.  And these people were saying that they didn't sign that, that's not what they told them.  The translator that was in there told them that was not what – that was not turning the job down.
So I told them that they would have to talk to [Snead].  You know, she's give me that piece of paper, and if they didn't get the job, you know, I'd have to move on to the next person on the list.  And so they would go ask her about it, and [it] would start confrontations out there.
MR. CARR: Who is "her"?
THE WITNESS: Vickie Snead.
A: The person in front – team member – team member is what they call them – would go and ask her about it and say, I wasn't to come to first shift, that's not what I meant.  I want that job.  I want that job.  And they would commence quarreling out there in front of everybody.
. . . .
A: That's what I was telling [Light], what was actually happening out there the afternoons between in between shift change.
. . . .
Q: How many times had it occurred when you decided to talk to her about it, to Cindy Light?
**A: Twice.**  Employees were upset.
Q: What was the name in each of those instances – each of those two instances – of the complaining employee?
**A: The boy – all I know him by is Samuel – and the girl was Doreen Romero.**
Q: Samuel and Doreen.  Now, did both of these occasions that you're going to tell us more about occur in September?
A: To the best of my knowledge, yes.
Q: Okay.  And they were both hourly employees –
A: Yes, sir.
Q: – in the bargaining unit?
A: Yes, sir.
Q: In each case, there was a job posted that they bid on?
A: Yes, sir.
Q: And in each case they ended up not getting it?
**A: Well, Doreen eventually came to first, but I can't remember in which job. She had gotten nearly every job in debone over a period of the year that I was doing the superintendent's job.  She had signed to do every job and got it.  But she did make it to first shift, yes. Samuel was terminated.**
Q: Okay.  So tell me exactly what you witnessed involving Samuel.

8

A: He asked me was he going to get to come to first shift on that job bid.  I told him no, Vickie had give me a paper that he had signed stating he turned the job down.  Vickie approached us and asked him what was wrong, and he said that he did not say he didn't want the job; that he wanted to come first shift.  "I want to come first shift.  I want to come first shift."  She said no, you're not coming to first shift, I'll fire you if you go to first.  And he said, when you do, I'll tell them you got me my papers.

. . . .

Q: **So what was it about that situation that you went to Cindy about, the fact that this employee may have a lack of legal status to work there because of what he said about the papers?**

A: **Yes.  And that, you know – what the hollering in the plant – you know, everybody was hearing everything they was saying, and – yeah.  She needed to know that.**

Q: **Well, that's what I want you to tell me is, what did you go to [Light] to report on this situation?**

. . . .

A: **To report what I had overheard.**

Q: **And your concern there was what?**

A: **For the company, that she had got their papers.**

Q: **The concern was legal status –**

A: **Yes.**

Q: **– of an immigrant worker?**

A: **Yes.  Yes.  Yes.**

Q: Okay.  Any other details on that that you haven't told me?

A: No.  We just left.

. . . .

Q: All right.  **Now tell me whether the Doreen matter occurred in September.**

A: **She kept coming to me to asking me when she could come to first, when she could come to first.  And I told Cindy – all I asked Cindy to do was check on and find out why she was not letting her come to first, because she had got every job out there and said she hadn't signed no paper.  And I didn't have any paper at the time stating that she had turned these jobs down.**

Q: **So at the point when you went to Cindy, you didn't know anything about Doreen's situation except that she had wanted to come to first shift and you didn't know why she hadn't?**

A: Right.

. . . .

Q: So what did you tell Cindy when you went to report regarding Samuel and Doreen, word for word as best you can recall?

A: I think that's all we said about Samuel and Doreen.

Q: **Well, tell me exactly what you said to Cindy.**

A: **I just asked her to check into Doreen, what the situation was.**

Q: **About whether she had a right under the labor agreement to a job?**

A: **Right.**

> Q: **And what did you ask her to do on Samuel?**
> A: **I didn't ask her to do anything.  I just reported what I overheard.**
> Q: **Did you raise any other issues with Cindy when you talked to her about Doreen and Samuel?**
> A: **No.**

*See* Pl. Dep. Vol. II pp 71-81 (emphasis added).[8]

Based on the foregoing, Tyson contends, Haynie's reports to Tyson regarding Hispanics and job bids were <u>not</u> that Hispanics were not being permitted to bid on jobs (as would be prohibited by the statues).  In regards to Doreen, Tyson contends, Haynie never reported that she thought Doreen was not receiving job bids because she was Hispanic.  Rather, Tyson argues, Haynie asked Light to "look into" Doreen's situation regarding whether she had the right under the labor contract to a first shift job.  Tyson argues: "Requesting that a personnel employee look into a situation regarding an employee's desire to bid on a job is not the same as reporting a belief that an employee is not being permitted to bid on a job because of her race or national origin."  Tyson highlights Haynie's testimony that Doreen routinely received the jobs for which she bid, and Doreen was assigned to the first shift job she bid on after Light "looked into" the situation.

Regarding Samuel, Tyson argues, plaintiff clearly reported the job bid issue because she was concerned about Samuel's legal status to work and the fact that Samuel and Snead were having shouting matches on the plant floor regarding his status.  As with Doreen, Tyson argues, Haynie again not motivated by a belief that Samuel was a victim of discrimination because he was Hispanic.  Furthermore, Tyson notes, Haynie never reported to any Tyson employee that she thought Samuel

---

[8] According to Tyson, Haynie's only complaints related to job bids involved Doreen and Samuel, while the other complaints involved the alleged hiring of illegal aliens at Albertville.

was being denied job bids because he was Hispanic.[9]  Since Haynie has not established a good faith

belief that Tyson was not permitting Hispanics to bid on jobs, and this concern did not motivate her

complaints, Tyson contends that she has failed to establish that she engaged in protected activity.

Furthermore, Tyson asserts, Haynie has not shown that she sufficiently conveyed her "now

alleged belief that Hispanic employees were victims of discrimination" to anyone at Tyson, much

less a decision-maker regarding her demotion.  *See Coutu v. Martin County Bd. of County Com'rs*,

47 F.3d 1068, 1074 (11th Cir. 1995)(holding that a filed grievance did not amount to statutorily

protected activity where the written grievance contained a conclusory allegation of racial

discrimination, but during the hearing, the plaintiff made no allegation and offered no proof of race

or national origin discrimination); *Aldridge v. Tougaloo College*, 847 F. Supp. 480, 483 (S.D. Miss.

1994)(holding that plaintiff's grievance letter, which did not mention sex discrimination but merely

discussed insensitive behavior, evasiveness, and feelings of intimidation, was not conduct in

opposition to unlawful employment practice.)[10]  Tyson concludes: "Based on Plaintiff's testimony

regarding her complaints, a reasonable jury could not conclude that Plaintiff adequately informed

Tyson that she was complaining of discriminatory employment practices.  As such, Plaintiff cannot

---

[9] Moreover, Tyson asserts, the only other discussion Haynie ever had with Tyson management regarding Hispanics and job bids involved two Hispanic women who were permitted to change shifts (in violation of the collective bargaining agreement) because of childcare problems.  Haynie admitted that she reported these situations not based on a concern that the women were discriminated against (she admits they were treated more favorably than other employees) but because she did not know how to explain their favorable treatment with regard to job bids to other employees whom she supervised.

[10] Tyson also cites *Callahan v. Bancorpsouth Ins. Servs. of Miss., Inc.*, 244 F. Supp. 2d 678, 683-84 (S.D. Miss. 2002)(stating "an employee's statement cannot be deemed to be in opposition to an unlawful employment practice unless it refers to and opposes a specific practice of the employer" and determining "[the] relevant question, then, is not whether a formal accusation of discrimination is made **but whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner**.")(Emphasis added)(internal and other citations omitted).  *See also Dupont-Lauren v. Schneider (USA), Inc.*, 994 F. supp. 802, 823 (S.D. Tex. 1998)(holding an employee's statement did not constitute opposition where employee made vague comments that failed to apprize employer of any particular practices she viewed as discriminatory or unlawful.)

establish that she engaged in protected activity and her retaliation claim fails as a matter of law."

B. **Failure to Demonstrate that the Articulated Reasons for Demotion Are Pretextual**

Tyson generally discusses the law regarding pretext.[11]  "[P]retext analysis focuses on a narrow question: Would the proffered evidence allow a reasonable fact finder to conclude that the articulated reason for the decision was not the real reason?" *See Walker v. Prudential Property and Cas. Inc. Co.*, 286 F.3d 1270, 1276 (11th Cir. 2002).  To survive summary judgment, Tyson contends, Haynie must offer evidence that "casts sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs v. Plantation Patterns*, 106 F.3d 1519 (11th Cir. 1997)(citations omitted).  Noting three pretext arguments[12] previously made by Haynie in connection with her sex discrimination claim, i.e., (1) Steve Liverett as a proper comparator, (2) Walker's conflicting testimony regarding the reason for plaintiff's testimony, and (3) statements compiled from her coworkers in support of Haynie's managerial skills,[13] Tyson contends that these arguments fail to rebut Tyson's legitimate, nonretaliatory reason

---

[11] Once a plaintiff has established a prima facie case, the employer has the opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action. *See Olmstead v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998).  If the employer offers legitimate reasons, the presumption of retaliation disappears. *See Raney v. Vinson Guard Serv.*, 120 F.3d 1192, 1196 (11th Cir. 1997).  To survive summary judgment, the plaintiff must offer evidence on which a reasonable jury could find that the defendant's articulated reasons are a pretext for unlawful retaliation. *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001); *Olmstead*, 141 F.3d at 1460.

[12] Arguments and facts relating to this issue were detailed in the court's October 23, 2003 memorandum opinion.

[13] Tyson still argues that these co-worker statements are inadmissible hearsay and subject to its motion to strike filed on October 14, 2003.  Furthermore, Tyson again relies upon statements in *Peele v. Country Mutual Insurance Co.*, 288 F.3d 319, 329 (7th Cir. 2002) and *Dey v. Colt Construction and Development Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994) as depreciating the value of co-workers' generalized statements about a plaintiff's job performance.

12

for Haynie's demotion. According to Tyson, Haynie's "complete and utter" lack of pretext evidence proves fatal to her retaliation claims. Unlike plaintiffs in most retaliation cases, Tyson adds, Haynie has not offered the following categories of evidence to support her pretext claim: statements by decision-makers that establish retaliatory animus, evidence to dispute the employer's reason for taking the adverse employment action, and evidence of a similarly situated employee who engaged in similar misconduct but was treated more favorably than plaintiff.[14]

Additionally, Tyson reiterates its previous arguments about the timing of Haynie's demotion, highlighting Haynie's testimony that she complained about Hispanic employees in September 2001[15] and that her demotion occurred on February 27, 2001 (a five-month gap). *See Maniccia v. Brown*, 171 F.3d 1364, 1370 (11th Cir. 1999)(citation omitted)(finding that four-month lag between protected activity and termination insufficient to justify an inference of causation). Moreover, Tyson contends, there is no inference of retaliation based on the timing of Haynie's demotion because Haynie indisputably committed the offenses resulting in her demotion during that time frame. Tyson relies upon *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997), where the plaintiff alleged retaliatory discharge for exercising her rights under the ADA.[16] Although the plaintiff was terminated during the period when she requested ADA

---

[14] Notably, Tyson argues, a plaintiff's subjective belief of pretext is not sufficient. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318 (11th Cir. 1998)(stating "the pretext inquiry is concerned with the employer's perception of the employee's performance not the employee's own beliefs.") Here, Tyson contends, Haynie has not even attempted to argue that her own subjective beliefs support pretext. Instead, Tyson asserts, Haynie testified that she thought Tyson had retaliated because she reported allegations involving illegal aliens: "When I reported the hiring of illegal aliens, they commenced to start procedures in terminating me."

[15] Tyson notes that Haynie's deposition fixes September 2001 as the date of plaintiff's "Doreen and Samuel" complaints.

[16] Tyson asserts that ADA and Title VII retaliation claims are analyzed under the same framework. *See McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1075-77 (11th Cir. 1996).

accommodation, Tyson notes, the Eleventh Circuit determined that because plaintiff indisputably committed numerous acts of subordination during that same time period, there was no inference of retaliation based on "suspect timing." *Id.* at 1287-88 (quoting *Severino v. N. Fort Myers Fire Control Dist.*, 935 F.2d 1179, 1183 (11th Cir. 1991)); *see also Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)(noting that inquiry is not whether employee was guilty of misconduct but whether employer in good faith believed employee had done wrong and based termination upon this good faith belief); *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 762 n. 6 (9th Cir. 1996)("[A]n employer's discrimination does not immunize its employees from consequences of their wrongdoing.") In this case, Tyson argues, the undisputed evidence shows that Tyson had a good faith belief that Haynie committed the offenses for which she was demoted during this five-month period, and thus the timing of her demotion provides no inference of retaliation.

### C.    Tyson Would Have Made the Same Decision Regardless of Retaliatory Animus.

Tyson repeats arguments from its previous summary judgment submissions, relying upon *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989)[17] and *Mt. Health City School District v. Doyle*, 429 U.S. 274, 287 (1977).  If Haynie presents evidence that an impermissible reason was a motivating factor for her demotion, "the defendant can respond by arguing that the plaintiff has failed to prove that the impermissible reason was even a motivating factor [lack of pretext], or by

---

[17] The Civil Rights Act of 1991, Tyson notes, did not overrule application of the mixed-motive defense to retaliation claims. *See Pennington*, 261 F.3d at 1269 ("the 1991 Act overruled and limited the mixed-motive defense only in discrimination cases . . . but left the defense intact for retaliation cases . . . . Therefore, we hold that the mixed motive defense remains good law . . . with respect to [plaintiff's] Title VII retaliation claim"); *Lewis v. YMCA*, 208 F.3d 1303 (11th Cir. 2000)(same holding for ADEA retaliation claim). Tyson notes that at least six other Courts of Appeal have unanimously agreed that § 107 does not apply to retaliation claims. *See, e.g., Matima v. Celli*, 228 F.3d 68, 71 (2nd Cir. 2000); *Norbeck v. Basin Elec. Power Coop.*, 215 F.3d 848, 852 (8th Cir. 2000); *Kubicko v. Ogden Logistics Servs.*, 181 F.3d 544, 552 n. 7 (4th Cir. 1999); *McNutt v. Bd. of Trustees of Univ. of Ill.*, 141 F.3d 706, 709 (7th Cir. 1998); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 935 (3rd Cir. 1997); *Tanca v. Nordberg*, 98 F.3d 680, 684 (1st Cir. 1996). Tyson contends: "As such, in retaliation claims, a mixed-motive defense acts as an absolute bar to liability."

proving that the defendant would have taken the same action for a permissible reason alone, or by pursuing both tactics. The same occurrences can be material to either or both." *Pulliam v. Tallapoosa County Jail*, 185 F.3d 1182, 1186 (11th Cir. 1999).[18] Further, Tyson argues, *Pulliam* provides that a defendant need not admit a discriminatory motive to assert a mixed-motives defense.[19]

Tyson compares the facts and holding in *Lewis v. YMCA*[20] with the instant case. In *Lewis*, a former employee claimed that the defendant failed to rehire her in retaliation for her filing of an ADEA suit and presented evidence that the personnel manager (one of the decision-makers), stated "We can't hire you, you cost [the employer and management] too much money." The personnel manager also admitted that the decision not to rehire was based in part on plaintiff's lawsuit. Nevertheless, Tyson argues, the district court granted summary judgment to the YMCA on the grounds that the YMCA clearly would have made the same decision not to rehire plaintiff even absent the retaliatory motive because of plaintiff's previous violation of YMCA policies, i.e, submitting a false certification card. The Eleventh Circuit affirmed this decision.

Likewise, Tyson asserts: "There is ample evidence that Plaintiff would have been demoted regardless of whether she had reported complaints about Hispanics and tax withholdings or job bids." Tyson refers to Haynie's alleged poor attitude and lack of teamwork, which continued after

---

[18] The *Pulliam* court further stated: "Defendant's proof in asserting that Plaintiff was terminated for legitimate reasons is the same as the proof in asserting that Defendant would have terminated Plaintiff even in the absence of discriminatory reasons." *Id.* at 1186. The court notes *Pulliam's* procedural posture, i.e., post-trial rather than at summary judgment.

[19] Specifically, *Pulliam* found: "[T]he burden is on the plaintiff to establish that a defendant had a discriminatory motive; a defendant need not admit it, even in the alternative."

[20] *See* 53 F. Supp. 2d 1253 (N.D. Ala. 1999).

15

Haynie was given several opportunities to correct her performance.[21]

### D.   Plaintiff Has No Cognizable § 1981 Retaliation Claim

Tyson agrees with this court's citation to *Olmsted v. Emmanuel*, 783 So. 2d 1122, 1127 (D.C. Fla. 2001) in its October 23, 2003 memorandum opinion. *Olmsted*, Tyson contends, "provides a complete and thorough analysis of the Eleventh Circuit's treatment of retaliation claims under § 1981."[22] According to Tyson, *Little* supports the Eleventh Circuit's refusal to recognize a § 1981 retaliation claim when the plaintiff does not contend that she was retaliated against because of her race.[23] Tyson concludes: "Just as in *Olmsted*, Plaintiff's § 1981 retaliation claim must be dismissed as any contrary conclusion would go against Eleventh Circuit precedent as established in *Little*. As such, this Court should grant Defendant's motion for summary judgment as to Plaintiff's § 1981 claim as a matter of law."

---

[21] Weaver's testimony in this regard was discussed in the court's previous memorandum opinion.

[22] Tyson summarizes *Olmsted*. There, the plaintiff argued that his attorney committed malpractice by not alleging a retaliation claim under § 1981. The plaintiff, who was white, had claimed retaliatory termination because he had complained to his supervisors about employment practices that discriminated against black employees. The court determined that the plaintiff could not prevail on the malpractice claim because he could not have prevailed on his underlying section 1981 claim. The court held that the plaintiff could not state a retaliation claim because he did not allege retaliation because of his own race – white. *Olmsted* found: "To reach a contrary conclusion would require us to speculate that, if squarely faced with the question, the Eleventh Circuit, en banc, would recede from *Little*."

[23] Tyson again relies upon *Little*. Specifically, the Eleventh Circuit found: "Here, there is no evidence in the record – and Little does not suggest or allege – that the discrimination or retaliation allegedly leveled against him was due to his race; that is, Little does not contend that Carrier discriminated against him because he was white. Both the facts and legal framework of Little's action are grounded solely in the opposition clause of title VII and are unrelated to the concerns explicitly set forth in the language of § 1981."

*See also Andrews v. Lakeshore Rehabilitation Hosp.*, 140 F.3d 1405, 1412 (11th Cir. 1998)(after reviewing the history of section 1981 retaliation claims, finding that "[t]his review reveals that despite the changing definition of 'make and enforce,' retaliation claims have remained viable *to some extent* throughout this time period. Nonetheless, this history also indicates that the type of retaliation claims that may be proved still depends on when the retaliation occurred and the *specific nature of the retaliation claim* . . . . Even as to retaliation claims after the 1991 Act, not all retaliation claims are necessarily cognizable."

## II.   Plaintiff's Supplemental Brief[24]

### A.   Plaintiff Has Clearly Produced Sufficient Evidence To Show She Engaged in Activity Protected by Title VII And/or Section 1981

Plaintiff contends that she has met the requirements of a prima facie case of retaliation under Title VII or Section 1981. *See Taylor v. Renfro Corp.*, 84 F. Supp. 2d 1248, 1254 (N.D. Ala. 2000). Unlike Tyson, Haynie answers "yes" to the court's question "whether complaints motivated by concerns other than real concerns for the protected class are subject to retaliation claims." Haynie relies upon *Merritt v. Dillard Paper Co.*, 120 F.3d 1181 (11th Cir. 1997)(finding that sexual harasser's involuntary testimony in a Title VII lawsuit still qualified for protection under Title VII's participation clause). Haynie provides the following *Merritt* excerpts:

> Congress enacted as part of Title VII an anti-retaliation provision that prohibits an employer from taking action against an employee, "because he has ... participated in any manner" in another employee's Title VII proceeding. At least as we are required to view them at this stage, the facts are that another employee filed a Title VII lawsuit against the employer alleging sexual harassment, and the plaintiff- employee in the present case was fired because he gave deposition testimony in that other lawsuit which was unfavorable to the employer. Those facts would seem to describe a clear cut violation of the anti-retaliation provision, but there is a twist.

> The twist is that the plaintiff-employee in this case who was fired for giving the deposition testimony in the other lawsuit was himself one of the sexual harassers, he was opposed to the position of the Title VII plaintiff in the lawsuit in which he gave the deposition testimony, and he did not testify voluntarily. The district court held that these unusual facts took this case outside the scope of the anti-retaliation provision. Faced with the broad and unequivocal language of that provision, we disagree.

> . . .

> The district court thought that Title VII's anti-retaliation provision does not cover an involuntary witness who is opposed to the claimant's position, because that provision was designed to protect those who "aid" and "assist" Title VII claimants. There are two insurmountable problems with that reasoning. First, whatever design might be perceived behind the provision, the actual design put forward through the language of the provision

---

[24] Haynie incorporates by reference arguments from her previous summary judgment submissions.

does not require that the testimony or other participation aid or assist the claimant. Instead of making assistance to the claimant a prerequisite for protection against retaliation, Congress chose to make assistance only one of four alternative means of qualifying for such protection. Congress prohibited retaliation against anyone who "made a charge, testified, assisted, *or* participated in any manner."(emphasis added). Under the plain language of the provision, those who testify or otherwise participate in a Title VII proceeding are protected from retaliation for having done so, even if it turns out they were not of any assistance to the Title VII claimant.

The second problem with the district court's reasoning is that it equates the objective effect of participation--whether it aids or assists a claim--with the subjective intent of the participant. The assumption appears to be that an involuntary participant cannot be of any use to an enterprise. That is no more true of conscripted deponents than it is of conscripted soldiers. Even if assistance were a sine qua non for coverage under the anti-retaliation provision, a Title VII claimant can be assisted as much or more by the testimony of a hostile co-employee from whom the truth must be wrenched as by an *1187 employee who earnestly desires to help (but may not be in the position to do so). The point is well illustrated in this case. He hated to do so, and he tried every way to avoid it, but Merritt's reluctant deposition testimony did assist Moore in her claim against Dillard. Indeed, in the words of Dillard's president, that testimony was "the most damning to Dillard's case." So, even if assistance were a prerequisite to coverage under the anti-retaliation provision, Merritt did assist Moore's lawsuit, even though it was against his wishes.

The gist of the district court's holding and Dillard's position goes beyond the question of assistance per se. The underlying proposition is that no conduct qualifies for protection under the anti-retaliation provision unless it is done voluntarily for the purpose of assisting the claimant. Congress could have crafted the statutory provision that way. But it did not. Congress said "testified" and "participated in any manner," not "voluntarily testified" and "voluntarily participated." **There is no mention of motive in the statutory provision. Courts have no authority to alter statutory language. We cannot add to the terms of Title VII's anti-retaliation provision what Congress left out: the requirement of a good motive, a pure heart, a happy face.**

(Emphasis added by plaintiff).[25]

---

[25] The court notes, however, that *Merritt* distinguishes between the participation and opposition clauses. In countering defendant's reliance upon *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Eleventh Circuit stated:

> *McDonnell Douglas* was concerned solely with the opposition clause and left the participation clause out of its discussion of the anti-retaliation provision. (citation omitted). The opposition clause by its very nature focuses upon the motive of the employee, covering only one who "has opposed" any practice which violates Title VII. By contrast, the participation clause, which is what the present case is about, is not so limited. (citation omitted). Whatever fetters *McDonnell*

According to Haynie, the above-stated rationale also applies to the opposition clause.

Noting the statute's plain language, Haynie argues:

> Congress did not state that an employee's opposition, to be protected, must be
> motivated solely out of concern for the protected class.  Should Congress have
> intended to make the employee's intent and motivation a necessary element of
> a prima facie case, it could have easily done so by simply including the above
> language (or similar language) in the statute.  As stated in *Merritt*, since "[t]here
> is no mention of motive in the statutory provision," and the Court lacks "the authority
> to alter the statutory language[,]" this Court simply "cannot add to the terms of
> Title VII's anti-retaliation provision what Congress left out: the requirement of
> a good motive, a pure heart, a happy face." *Merritt*, 120 F.3d at 1187.

In order to rely upon the anti-retaliation provision of the opposition clause, Haynie

acknowledges, she must show that she "had a good faith, reasonable belief that the employer was

engaged in unlawful employment practices."[26] *See EEOC v. Total Sys. Servs., Inc.*, 221 F.3d

1171, 1174 (2000).  Haynie contends that some of her complaints dealt specifically with the

discriminatory treatment Hispanic workers suffered.[27]  Again, Haynie notes that Light cannot

recall and thus cannot deny that these reports were made.  Haynie also repeats her argument that

---

> *Douglas* clamped onto the anti-retaliation provision, they were put on the opposition clause only;
> the broad language of the participation clause was left unfettered.

Obviously, *Merritt* is a "participation" case.

[26] Haynie also cites *Taylor*:

> A plaintiff engages in "statutorily protected activity" when he or she protests
> an employer's conduct which is actually lawful, so long as he or she demonstrates
> "a good faith, reasonable belief that the employer was engaged in unlawful
> employment practices.  However, it is insufficient for a plaintiff "to allege [her]
> belief in this regard was honest and bona fide; the allegations and record must
> also indicate that the belief, though perhaps mistaken, was objectively reasonable.

This does not address the distinction between "participation" and "opposition."

[27] By plaintiff's account, she told management that Hispanic employees had been instructed to list at least
seven dependents on their W-2 forms (to result in no federal tax withholdings) and that Snead would not allow
Hispanics to bid on open jobs and threatened to terminate them if they did bid.

Phillips's denial of knowledge of these allegations contradicts Tilton's assertion that Phillips told him about these allegations.[28]

Haynie quotes language from § 703(a)(1) of Title VII as well as Tyson's own harassment language. Again, Haynie contends, a question of fact exists regarding what exactly Haynie reported to Tyson management: "If Light, Haynie, and Tilton are to be believed, Haynie certainly complained about discriminatory treatment directed towards Hispanic employees." Haynie again references her W-2 and job bidding complaints as evidence of "allegations of discriminatory treatment with respect to the Hispanic employees compensation, terms, conditions or privileges of employment." Furthermore, Haynie argues, since the record evidence establishes that this conduct was only directed towards Hispanic employees, "there can be no serious dispute but that clear questions of race, color, or national original discrimination was, in fact, raised by Haynie."

_____

[28] After a recess, the court notes, Tilton testified:

Witness: Before we go on, can I clarify something? You were asking about how did I find out about the allegations that we were requiring Hispanics to put down seven dependents or something else. What was it? Really unrelated to immigration, but I said I thought I heard that from Jerry. He's telling me that's not true. I really don't know how I heard. I just know that it was brought up. It was not – it was not part of my focus because how many people - I mean, there's nothing to gain for Tyson Foods for me to tell you to put down seven dependents. It doesn't make any difference to Tyson Foods that I know of why it would. You just get to bring home a little more money. And on the job bidding, we have a contract. And the contract says this is whole job bidding, and there is a grievance procedure for it. We don't go to jail for that. We might go to arbitration, but we don't go to jail for it. I wasn't concerned with those things, though. What I was concerned with was the allegations that Vicki was bringing in illegal folks and giving them somebody else's ID and allowing them to work without us being aware of it. And that's really why I was here. It if had been those other things, I wouldn't have made the trip.
*Q: So you remember hearing those allegations?*
A: I remember someplace. Maybe some notes I read or something.
*Q: But Mr. Phillips told you, I guess during the break, that he didn't tell you that.*
A: Yeah.

*See* Pl. Ex. 8, at 64-65.

**B.**     **Pretext**

According to Haynie, there is ample evidence of pretext.[29]  Regarding her demotion,

Haynie repeats Walker's allegedly conflicting testimony, i.e.: "[T]he decision to demote Dana

and to get her out of the debone department, because at that time we had moved [Snead] into first

shift and she was the superintendent and Dana was a supervisor working for Snead.  That created

a lot of conflict."  Furthermore, Haynie contends, testimony from Tyson management regarding

her alleged negative attitude does not jibe with her positive evaluation in October 2001, thereby

creating a genuine issue of fact.

As further evidence of pretext, Haynie highlights statements from Tyson co-workers

attesting to her positive attitude at work.  *See* Pl. Ex. 10.[30]  Based upon *Macuba v. Deboer*, 193

F.3d 1316, 1323 (11th Cir. 1999), Haynie contends, these statements survive since they could be

---

[29] Haynie repeats the alleged retaliatory actions by Tyson, i.e., (1) the November 9, 2001 debone meeting (which occurred two weeks from the time of Haynie's report of and Tyson's investigation into illegal employment practices) and accompanying memo entitled "Problems in the Debone Area." Facts pertaining to this meeting have been discussed more fully in this court's October 23, 2003 memorandum opinion.; (2) the November 27, 2001 counseling for a "negative attitude"; (3) the December 12, 2001 memo to Haynie dealing with calling into work; (4) Haynie's February 2002 harassment complaint against Snead; (5) the February 27, 2002 demotion while Haynie was on medical leave; (6) the undisputed fact that Haynie was never disciplined prior to her October 2001complaints about unlawful employment practices regarding Hispanics; and (7) Haynie's excellent employee evaluation immediately prior to the October complaint.

Regarding (4), Haynie contends, Light and Phillips "utterly violating company policy in handling this complaint."  Regarding (6), Haynie again argues that she is the only management member at the Albertville plant to be demoted from supervisory position to a general laborer position.  Regarding (7), Haynie relates specific comments from her October 2001 evaluation, namely:

> Dana is very committed to her job she has taken on extra responsibility and has done an excellent job; Dana is focused on all the issues that occur in her area of responsibility and takes the initiative to correct on her own.  She goes out of her way to help other supervisors with problems that may arise and finding solutions to correct them; Works well with all supervisor and team members treats all with respect; Dana is a very committed and dependable supervisor.  Takes on a lot of responsibility and does an excellent job.  Treats all members with the respect that they deserve.

[30] As noted earlier, Tyson has filed a motion to strike this exhibit.

21

easily reduced to admissible evidence at trial by calling each of the signatories as witnesses and having them acknowledge their signed statements.

However, Haynie asserts, the statements are nonhearsay based on the following: (1) the signatories were agents or servants of Tyson and (2) the statements encompass facts that the employees necessarily witnessed in the line of and during their employment. *See* Federal Rules of Evidence, Rule 801(d)(2)(D).[31] Moreover, Haynie argues, the statements qualify for three exceptions to the hearsay rule: (1) statements of the declarants' then existing state of mind, emotion, sensation, or physical condition pursuant to Rule 803(3); (2) attestations of Haynie's reputation or character pursuant to Rule 803(21); and (3) statements covered by the residual exception embodied in Rule 807.[32] Regarding the latter, Haynie contends:

> There is no question but that the statements are offered as evidence of a material fact. Further, there are at least forty-two Tyson employees who signed these statements. The attorneys' fees and costs (to both parties) associated with deposing all of these people (and even obtaining affidavits from them) would be extremely high and probably cost prohibitive. As such, the statements are the most probative evidence on this point that Haynie could be expected to procure through reasonable efforts. Finally, for these same reasons, the interests of justice will be best served by the admission

_____

[31] Rule 801(d)(2)(D) deems non-hearsay "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." The statements, however, were obviously not made in the line and scope of employment.

[32] Rule 807 of the Federal Rules of Evidence provides:

A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement, and the particulars of it, including the name and address of the declarant.

of this evidence.

Finally, Haynie contends, another fact shows pretext.  On the day of her demotion, Haynie alleges, she was informed by another employee that plant manager Weaver stated he was looking for a reason to fire her.[33]

## III.   Defendant's Reply

According to Tyson, the case law clearly establishes that plaintiff's subjective motivation is relevant to her retaliation claims.  Tyson distinguishes *Merritt* (plaintiff's legal authority for her opposition claim)[34] and states that *Merritt* in fact supports Tyson's position.  In *Merritt*, Tyson argues, the Eleventh Circuit determined whether a plaintiff's involuntary participation in a sexual harassment investigation was protected by Title VII's participation clause.  The Eleventh Circuit's analysis discussed the *McDonnell Douglas* holding that Title VII's anti-retaliation provision "forbids discrimination against applicants and employees for attempting to protest or correct allegedly discriminatory conditions of employment."[35]  Additionally, Tyson relies upon *Booker v. Brown v. Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir. 1989)(explaining how the participation clause provides wider and stronger protection than the opposition clause). While plaintiff's retaliation claim is squarely within the opposition clause, Tyson argues, her

---

[33] Haynie contends that Weaver's alleged statement qualifies as a statement against interest and/or admission by a party opponent (*see* Rule 801(d)(2)) as well as a statement of Weaver's then existing state of mind, emotion, sensation or physical condition.  According to Haynie, the statement is highly relevant to impeach Weaver, who has denied making the statement.  The court does not make a present determination as to the admissibility of any of the statements.  It is unlikely that they will be admissible.

[34] Tyson quotes the two separate clauses in Title VII's anti-retaliation provision: (1) the "participation clause," prohibiting discrimination against an employee "because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this title;" and (2) the "opposition clause," prohibiting discrimination against an employee "because he has opposed any practice made an unlawful employment practice by [the statute.]"

[35] This analysis has already been discussed by the court in Footnote 25, *see supra*.

contentions about motivation (based on *Merritt*) apply <u>only</u> to participation clauses and thus are irrelevant to her claims.  According to Tyson, even *Merritt* clearly states "[T]he opposition clause by its very nature focuses on the motive of the employee."[36]

Furthermore, Tyson argues, the evidence clearly establishes that Haynie lacked a good faith reasonable belief that her alleged complaints were complaints of employment practices that violated the statutes.  Again, Tyson contends, Haynie has not cited legal authority for her claims that Tyson's alleged instructions to Hispanics to claim more dependents for the purposes of tax withholding (which would actually benefit the employees) violate the statutes.  Furthermore, Tyson argues, the plaintiff testified that the did not subjectively think the practice was discriminatory as it <u>benefitted</u> the employees.  Tyson concludes: "[A] complaint regarding listing a larger number of dependents for tax withholding purposes is not opposition to employment practices prohibited by the statutes."

Regarding plaintiff's alleged complaints of job bids, defendant relies upon the same lengthy quote from plaintiff's deposition.  *See supra* pp. 8-10.  According to Tyson, Haynie's deposition testimony:

> establishes that she did not report that employees were not being permitted to bid on jobs because they are Hispanic – she reported that Snead and Samuel were in a shouting match about job bids in which they traded barbs on Samuel's legal status to work . . . . [P]laintiff testified that she reported this fight because she was concerned about Samuel's legal status to work and Snead's possible involvement in obtaining his illegal paperwork.   Further, it is undisputed that Plaintiff <u>never</u> reported that she thought Doreen did not receive a job bid because she was Hispanic. Instead, Plaintiff asked Light to "look into" the situation and Doreen later

---

[36] Defendant's arguments and citations in this regard have already been discussed earlier in this memorandum opinion.  Specifically, Tyson contends, Haynie's deposition testimony establishes that she complained about the job bid situation out of concern for Samuel's legal status to work and the possibility that Snead obtained his illegal paperwork.

received the transfer to first shift.

Tyson repeats evidence it contends shows Haynie did not have a good faith reasonable belief that she was reporting discriminatory employment practices and that she never conveyed to anyone at Tyson, much less a decision-maker involved in her demotion, that she held such good faith reasonable belief.[37]

Regarding pretext, Tyson restates arguments from its previous summary judgment submissions and quotes this court's determinations from its October 23, 2003 memorandum opinion. Addressing the November 9, 2001 meeting with Weaver and Haynie's November 27, 2001 counseling for a negative, Tyson asserts, this court determined: "It is a total stretch to suggest that the counseling about the admitted hostility between Snead and others was somehow retaliatory against the plaintiff." Regarding Tyson's handling of her "harassment" complaint against Snead, this court determined: "Plaintiff's criticism of the personnel practices of Light and others regarding not taking notes, not opening files, etc., has little, if any significance."

As for the December 12, 2001 counseling for failing to call into work, Tyson contends, plaintiff has not shown that she did not commit the underlying wrong or was treated differently than any other employee. As for Haynie's October 2001 positive employment review, Tyson further contends, "the undisputed evidence establishes that Plaintiff's job performance/attitude substantially deteriorated after she received her final performance review." Noting that the October 2001 review covered October 2000 until September 2001, Tyson argues: "It is undisputed that Plaintiff was first counseled for her poor attitude and lack of teamwork (along with all of the other Debone supervisors) in November 2001 . . . . It is undisputed that it was

---

[37] Tyson again cites *Coutu v. Martin, see supra.*

25

after this time that Plaintiff's attitude deteriorated, even after Plaintiff was counseled on several occasions and given an opportunity to improve."

Addressing the demotion, Tyson contends, plaintiff has not provided evidence of a similarly situated employee at Tyson who was treated more favorably than Plaintiff, i.e., an employee who was repeatedly counseled for an unimproved, admitted bad attitude who was not demoted or terminated.[38]  Turning to plaintiff's assertion that Walker provided inconsistent reasons for her demotion, Tyson notes its previous extensive briefing on the topic.

Tyson repeats its argument about Exhibit 10, contending that the co-worker statements are inadmissible hearsay.  To keep within the court-mandated page limit, Tyson contends, it cannot fully counter all of plaintiff's asserted exceptions to hearsay.  Tyson states: "However, to the extent the Court desires further legal analysis of whether this evidence is inadmissible hearsay, Defendant requests the opportunity to fully brief this legal issue."  Defendant provides several reasons why this evidence would be inadmissible hearsay, including: the present sense exception does not apply because the statements are not being used to establish the declarant's state of mind (i.e., motive, intent, etc.), *see U.S. v. Samaniego*, 345 F.3d 1280, 1282 (11th Cir. 2003); the proper foundation has not been laid to permit reputation testimony pursuant to Rule 803(21) , *see Michelson v. U.S.*, 335 U.S. 469, 478 (1948)(in criminal case, stating that a witness testifying to party's reputation must "qualify to give an opinion by showing such acquaintance with the party, the community in which he has lived and the circles in which he has moved, as to speak with authority of the terms in which generally he is regarded;" and the residual exception

---

[38] Tyson repeats arguments about Haynie's demotion, Liverett's, and Ramirez's demotions, which have already been detailed in the court's previous memorandum opinion.  Like plaintiff (who was demoted from supervisor to general laborerer), Tyson argues that Liverett and Ramirez were also demoted one level down (from superintendent to supervisor).

is inapplicable due to the unreliability of the testimony, *see Federal Trade Commission v. Figgie*, 994 F.2d 595, 608 (9th Cir. 1993).[39]

After again citing *Peele* and *Dey*, Tyson argues Haynie's lack of evidence that any of the petitioning employees ever notified any Tyson management of their opinion regarding plaintiff's attitude.[40]   Further, Tyson contends, Weaver's testimony of receiving reports of plaintiff's poor attitude and lack of teamwork from supervisors and hourly workers (even after she was given an opportunity to correct it) has not been disputed.   Tyson also asserts that the statements in Exhibit

---

[39] In *Figgie*, defendant contends, the court determined that the letters were reliable in that they were unsolicited and randomly mailed by customers. Here, Tyson argues, the statements were solicited by plaintiff to be used in support of her position. Further, Tyson notes, plaintiff testified that at least two of the employees, Kathy Zawalski and Verna, would have desired seeing Snead terminated as a result of their letter writing campaign. Furthermore, Tyson argues, the fact that other statements were typed using the same language and signed in petition form indicates that the substance of the statements does not pass the reliability test.

[40] Tyson offers the following excerpt from plaintiff's deposition:

*Q: Okay.  So until last week, did the company ever have any information from any of those people supporting you?*
A: I don't have any knowledge of that.
*Q: Okay.  Did you have any knowledge of any person who signed these papers ever expressing their support for you to management at Tyson.*
A: Yes.
*Q: Okay.  Who and when?*
A: That the nurse told me that Nancy Hampton come in there talking about what a good job I had done and –
. . .
*Q: I see.  So Nancy told the nurse.*
A: Yes.
*Q: But she didn't say it to anybody who's been involved in making decisions about your employment, right?*
A: Right.
*Q: Did any of the people to your knowledge tell any of the people who had been making decisions about your job about what they thought about your good performance?*
A: I was told – I was told that in a safety meeting, they had asked when I was coming back, that things weren't going good, you know, that some people brought it to their attention in a safety meeting.  But that was after I was demoted.
*Q: And who was running the safety meeting?*
A: Pam Blackmun.
*Q: And did she make any decisions about your employment?*
A: No.  They had changed her department.

10 contain no information about what time frame they address.  While Tyson agrees that Haynie

was a good line supervisor and had a good attitude prior to November 2001, Tyson highlights

evidence that after this time Haynie's attitude and performance deteriorated, leading to

counselings and paid leave.  Tyson argues; "To the extent these employee statements are

addressing Plaintiff's attitude prior to November 2001, they provide no evidence to dispute

Tyson's legitimate nonretaliatory reason for her demotion."[41]

Turning to Weaver's alleged statement as evidence of pretext, *discussed supra* p. 23,

Tyson contends, this statement represents double hearsay not cured by the admission by a party

hearsay exception.  Plaintiff testified that she did not hear Weaver make the alleged statement

regarding her termination, but that a co-worker, Burgess, informed her that Weaver made the

statement.  In fact, Tyson observes, Burgess testified via declaration that she never made such a

statement to Haynie.  Thus, Tyson contends, there is no way to reduce this inadmissible hearsay

evidence to admissible evidence at trial with Burgess's testimony.  Further, Tyson contends,

plaintiff's contention that she can overcome the hearsay exception by using the alleged statement

for impeachment purposes is meritless.  *See Goodman v. Pennsylvania Turnpike Commission*,

293 F.3d 655, 666 (3rd Cir. 2002)(finding a party cannot "pretend that inadmissible hearsay

evidence is being used to impeach a witness so that the jury will hear its substance").  Tyson

contends that plaintiff is clearly offering the alleged statement by Weaver for the truth of the

_____

[41] Tyson repeats the following evidence of plaintiff's poor attitude: (1) Gayle Hinton's statement to Weaver that plaintiff told her that she hated working at Tyson and dreaded coming to work every day; (2) another supervisor's informing Weaver that he heard plaintiff say she didn't have to work in "F-word" place and that she "could go find her a damn job somewhere else" – statements allegedly made by plaintiff in front of other team members and supervisors; (3) plaintiff's 5-hour tardiness on November 26, 200 without calling in; and (4) after this incident, another absence without calling in.

matter asserted, not for impeachment.[42]

Finally, Tyson reiterates, the company would have made the same decision to demote Haynie regardless of any retaliatory animus.[43]

## CONCLUSIONS OF COURT

Although something tells the court that it is unlikely that the decision to transfer and demote plaintiff was based on the "dependents" and "no bid" factors, the court cannot so determine as a matter of law. Obviously, if it occurred, not allowing Hispanics to bid on shifts would be racially discriminatory. Further, telling Hispanics to list extra dependents, if it occurred, could be considered employment discrimination because it affects a condition of employment – pay – and could cause later problems for the affected employees.

This is a case in which the court will have to consider the evidence at trial before making any sufficiency decisions. The parties should restrict the evidence to those issues which remain in the case.

This __31__ day of December, 2003.

ROBERT B. PROPST
**SENIOR UNITED STATES DISTRICT JUDGE**

---

[42] Since Burgess's testimony offers no support for Haynie's impeachment argument, Tyson asserts, "Plaintiff's hearsay testimony in this matter would be offered to impeach Burgess, not Weaver, an endeavor which would be entirely irrelevant to plaintiff's claims."

[43] Again, Tyson relies upon *Price Waterhouse*, *Mt. Healthy School District Board of Education*, *Harris v. Shelby County Board of Education*, and *Pennington* (affirming summary judgment in a circumstantial evidence case based on *Price Waterhouse* mixed-motive analysis).

29